UNITED STATES of America, Plaintiff,

v.

Kenneth F. BOULA and Earl Dean Gordon, Defendants.

No. 90 CR 106.

United States District Court, N.D. Illinois, E.D.

March 18, 1992.

Debra DeVaney, U.S. Atty., for U.S.

David J. Stetler, McDermott Will & Emery, Chicago, Ill., for Kenneth F. Boula.

Walter Jones, Jr., Chicago, Ill., for Earl Dean Gordon.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case involves several complicated sentencing issues. Kenneth F. Boula and Earl Dean Gordon, the defendants, were convicted of mail fraud in 1990 and were sentenced accordingly. The defendants appealed their sentences. On appeal, the defendants' original sentences were vacated; and the case was remanded on May 14, 1991 for resentencing.

## BACKGROUND

In the late 1970s, Kenneth F. Boula and Earl Dean Gordon established a business venture known as Financial Concepts. Through this venture, the defendants were able to conduct a massive mail fraud scheme which involved inducing a large number (approximately 3,300) of people to invest in a series of limited real estate partnerships. The defendants advertised these partnerships, offered free seminars, personalized investment counseling, and real estate tours, all in an effort to attract

investors. Messrs. Boula and Gordon informed the investors that their financial contributions would be used to purchase property and to make improvements. The investors were further informed that after the property sold they would receive their principal investment plus interest. Contrary to what the investors were promised, the defendants attracted more investors and used these funds to pay interest to both the old and new investors. As a result of this pyramid or Ponzi scheme, the investors' losses were approximately $5.2 million. The defendants were able to acquire an additional $1.8 million through three income partnerships. Rather than using the money for the income partnerships in the manner that the defendants had represented that it would be used, they diverted these funds towards operational costs and paying off other investors' demand notes. In March of 1988, the Illinois Secretary of State issued an order prohibiting the defendants from continuing to establish their limited real estate partnerships.

The defendants were charged with three counts of mail fraud in violation of 18 U.S.C. § 1341, in an information filed February 15, 1990. The defendants pled guilty to these three mail fraud counts. Following a hearing on June 15, 1990, the defendants were sentenced to 108 months of incarceration by this court. At that time, the court made the following findings: (1) that the initial real estate, Ponzi, and income partnership schemes were a part of the fraudulent criminal activity; (2) the total loss from the fraud was $7 million; (3) the defendants targeted vulnerable victims, among them older investors who were seeking retirement income to supplement their social security payments; and (4) that they used the spoils from their criminal activity to support an "extravagant" lifestyle. *United States v. Boula,* 932 F.2d 651, 653 (7th Cir.1991).

The defendants appealed that sentencing determination and made two essential arguments. First, that this court's applica-

tion of sections 2F1.1 and 3B1.1 of the United States Sentencing Guidelines ("Guidelines") resulted in impermissible double counting (i.e. inappropriate sentence enhancement through the application of two Guidelines provisions to the same conduct). The defendant's second argument asserted that this court's upward departure from the applicable Guidelines range was unwarranted and improper. *United States v. Boula,* 932 F.2d 651 (7th Cir.1991). The Seventh Circuit rejected the defendant's double counting argument.[1]

In reviewing this court's departure from the Guidelines sentencing range, the Seventh Circuit noted the following three grounds on which the ten-point departure was based:

(1) the commentary to section 2F1.1 explains that when the offense involves more than minimal planning and more than one victim, upward departure may be warranted;

(2) the Commission did not account for fraud schemes involving as many victims as in this case; and

(3) the $7 million loss exceeded the $5 million floor in the highest loss category for fraud defenses.

The Seventh Circuit held that departure based on the first stated ground was proper reasoning that, "the Commission explicitly provided for departure in such a situation and ... the defendants' scheme so exceeded the Guidelines base provisions in section 2F1.1(b)(2)". *Boula* at 656. The court rejected, however, the remaining two grounds for departure. In evaluating the degree of departure, the court held that the ten-point increase was unreasonable. The court then vacated the defendants' sentences and remanded the case for resentencing.

## DISCUSSION

A. *Accounting for the Number of Victims under the Sentencing Guidelines*

First as a preliminary matter, more discussion is warranted on the Seventh Cir-

1. The court noted that "otherwise extensive" as used in section 3B1.1 applies to the "number of people involved in the operation not the extent

of the criminal activity". *Boula* at 654; thus § 2F1.1(b)(2) and § 3B1.1(a) are not mutually exclusive sections. *Boula* at 655.

cuit's treatment of the court's application of the section 2F1.1 to the number of victims in this case. It is this court's opinion that the Sentencing Guidelines Commission did not account for fraud schemes involving as many victims as there were in this case (3,300). This was the court's second stated reason for upwardly departing in its initial sentencing of defendants Boula and Gordon. While the court concedes that the Sentencing Commission did address the number of victims issue in a very limited way, it was not done in an adequate and detailed manner. Section 2F1.1 provides for an increase of two levels if the offense involved "more than one victim". The Seventh Circuit made essentially two arguments in response to this court's concerns that the number of victims were not taken into account. First, that the Commission provided for the number of victims through the "more than one victim" enhancement. Second, that the large loss level tables adequately take into account the number of victims. *Boula* at 656, 657.

The Seventh Circuit's discussion of this court's second stated reason for departure uses conclusive phrases such as "highly likely" and "surely more than mere oversight" to assert that the number of victims in this fraud case is not "outside the heartland of the fraud provisions." *Boula* at 656. The policy statement, however, referred to in the Seventh Circuit opinion actually supports this court's action in creating a vector system and thereby refining the sentencing provision "more than one" victim to distinguish between 2 victims and 3,300. The policy statement asserts as follows:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland", a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. Ch. I, pt. A (4)(b), pp. 1.5–1.6 (policy statement).

The court relied on two provisions when it made an upward departure in the sentencing of the defendants. The first provision, 18 U.S.C. Section 3553(b) provides that a departure may be appropriate if:

> [t]he court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the sentencing commission in formulating the guidelines.

The second provision is section 5K2.0 of the Guidelines which states that grounds for departure include any factors in addition to those identified by the Commission "that have not been given adequate consideration by the Commission." Prompted by 18 U.S.C. § 3553(b) and section 5K2.0 of the Guidelines, the court created a vector system, for its initial sentencing of the defendants, to address the inadequate treatment under the guidelines of the number of victims in fraud cases, which could result in substantial inequities in sentencing. It is this court's firm opinion that the Sentencing Commission did not adequately take into consideration the number of victims in fraud schemes. There is a difference between when two victims fall prey to a swindler's scheme and when 3,300 persons are victims of a fraudulent scheme. The varying number of victims should be reflected accordingly in the harshness of the defrauders' sentences.

Contrary to the Seventh Circuit opinion, this court does not agree with the conclusion that the "Commission accounted for massive fraud through the dollar amounts of the loss table." *Boula* at 656. In this court's view, the crime is more heinous if, as in this case, there are 3,300 victims and the total loss is $7 million as opposed to if there were 10 victims with the same loss amount and the differing circumstances of the victims are considered. The Seventh Circuit concludes that the Commission chose to factor the sentencing level according to the total loss, not the number of victims. But by the court's own example of 10 victims versus 3,000 with a total loss of $7 million for both, it is evident that the number of victims is not adequately accounted for through monetary losses.

While the court agrees with the Seventh Circuit that the amended version of section 2F1.1 which sets the floor amount of the highest loss level at $80 million, suggests that the Commission contemplated massive fraud, the court asserts that "massive" refers to the amount of loss and not the number of victims. The two are not the same.

There is a need for alterations to section 2F1.1 of the guidelines that will adequately address the number of individuals who fall victim to a fraud scheme or that will allow for an upward departure according to some chart such as the vector system this court devised for the first sentencing. This would ensure that, in cases such as these, a defendant who has defrauded a substantial number of people out of their property, their life savings, and their hopes for the future is sentenced more harshly than a defendant who has defrauded only two people out of the same items. While the former has committed 3,000 crimes, the latter has committed two. Application note 9 to section 2F1.1 observes that "[d]ollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted." In the court's view, this case presents one of those instances. Given that the court must sentence the defendants in conformity with the Seventh Circuit opinion, however, the number of victims is *not* used as a basis for enhancing the following sentence.

## B. The Application of Pre–November 1989 Guidelines

On September 26, 1991 this court issued a revised notice of grounds for possible upward departure in resentencing the defendants in a manner consistent with the Seventh Circuit *Boula* opinion. 774 F.Supp. 506. In the revised notice, this court carefully articulated its rationale for sentencing the defendants according to all of the provisions in the pre-November 1989 guidelines, including application note 1 to section 2F1.1 [2] rather than in the piecemeal fashion initially suggested by the defendants. In light of this notice, the government and the defendants have agreed that the pre–November 1989 sentencing guidelines should govern this sentencing.

## C. Calculating the Sentence

The defendants pled guilty to three counts of mail fraud which are grouped in accordance with § 3D1.2(d). The base offense level for fraud is 6 (2F1.1(a)). Because the loss exceeded $5 million, an 11 point increase is warranted. (2F1.1 (b)(1)(L)). The offense involved "more than minimal planning" *or* "more than one victim", so another 2 points is provided for under Section 2F1.1(b)(2)(A) & (B). A 4 level adjustment is allowed because the defendants were organizers or leaders. (3B1.1(a)). That brings the defendants' total to 23 points. Both parties agree that the defendants are entitled to a 2 point downward adjustment for acceptance of responsibility which brings the defendants' sentencing level down to 21 points. Both parties were in agreement with the sentencing level up to this stage. The following two issues were in dispute:

1. The appropriate degree of upward departure; and

2. Whether the two-level enhancement authorized under section 3A1.1, for specifically targeting unusually vulnerable victims should be imposed.

The defendants were originally sentenced in June of 1990, after the November 1989 amendments took effect. At that time this court applied the pre–1989 guidelines because applying the amendments would have increased the defendants' base offense level by 3 points (base offense level of 20 for loss in excess of 5,000,000 § 2F1.1). This retrospective application of an increased penalty is prohibited. See generally, *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987).

---

**2.** In the Revised Notice, this court noted that it agreed with the reasoning of other courts in cases such as *United States v. Stephenson,* 921 F.2d 438, 441 (2d Cir.1990) in which that court held that the guidelines were intended to be applied as a "cohesive and integrated whole" and *United States v. Lenfesty*, 923 F.2d 1293, 1299 (8th Cir.1991) in which the Eighth Circuit held that the "most reasonable interpretation of these [guideline] provisions is that they move in concert." (Revised Notice of Grounds for Possible Sentencing Departure, pp. 5, 6 issued September 26, 1991).

### 1. The degree of upward departure

■ The Sentencing Commission's application note 1 to § 2F1.1(b)(2) indicates that if two or more of the provisions for this section are satisfied then upward departure may be appropriate. The government has argued for a 3 point upward departure based upon the Seventh Circuit opinion that some departure from the guidelines is appropriate in view of the application note and given the coincidence of "more than minimal planning and more than one victim" in this case.[3] In response, the defendants have argued that an upward departure of only 1 point should be allowed because the defendants are already receiving 2 points as provided for under section 2F1.1 because the offense involved more than minimal planning *or* more than one victim. The court does not find the defendants' argument persuasive. The presence of the application note suggests that the Sentencing Commission considered crimes involving the coincidence of these factors as meriting harsher treatment. This court agrees. The coincidence of both of these factors indicates the seriousness of the defendants' crime. It is because of the serious nature of the crime that this court, initially, contemplated upwardly departing from the guidelines. Therefore, following what it perceives to be the guidance of the Seventh Circuit, 3 points will be applied to the defendants' sentences as authorized under application note 1 to §. 2F1.1(b)(2). With the addition of these 3 points, defendants' sentencing level is 24.

### 2. Targeting Vulnerable Victims—3A1.1

■ The government has presented an argument that the defendants specifically targeted the elderly to invest in their real estate schemes and that a two-level enhancement is appropriate. Initially, this court made a finding that the defendants targeted vulnerable victims.[4] The defendants have filed a motion to reconsider that ruling. After reviewing the statistical information provided by the government and in light of a recent Seventh Circuit slip opinion on this issue, *United States v. Randall Sutherland*, 955 F.2d 25 (1992), the court has decided to grant the defendants' motion to reconsider for the reasons stated below.

Section 3A1.1 provides for a two-level enhancement if:

> ... the defendant knew or should have known that the victim of the offense was unusually vulnerable due to age, physical or mental condition, or that the victim was particularly susceptible to the criminal conduct ...

The first application note to this section states that the adjustment applies to "any offense where the victim's vulnerability played any part in the defendant's decision to commit the offense."[5] The question of whether the victims were "unusually vulnerable" within the meaning of § 3A1.1 is a question of fact. *United States v. Creech*, 913 F.2d 780, 782 (10th Cir.1990). The court should focus on who the defendants targeted and not on those who were defrauded as a result of the defendants' solicitations in making its determination on whether there are vulnerable victims in this case. See *United States v. Wilson*, 913 F.2d 136, 138 (4th Cir.1990).

#### a. Defining a category of vulnerable victims

The category of vulnerable victims to which we are referring must be adequately

---

**3.** In footnote 6 to the Seventh Circuit *Boula* opinion the court suggested that a 3 point departure may be appropriate. The court was noting that the new tables (accounting for a $7 million loss) did not apply to this case. The court pointed out, however, that the new table authorized a 14 point adjustment for offenses between $5 million and $10 million (rather than the 11 point increase in the 1988 table for offenses above $5 million) and stated that "[t]his difference may serve as guidance in determining an appropriate degree of departure".

**4.** At the sentencing hearing (June 15, 12990 Tr. 91–92) this court found that the defendants targeted, among others, the elderly.

**5.** The court is aware that the application note to section 3A1.1 provides that this section "would not apply to a situation where the defendant sold fraudulent securities to the general public and one of the purchasers happened to be senile."

defined in order to apply a § 3A1.1 adjustment to the defendants' sentences. The government has identified investors who are age 50 and upwards as the "elderly" individuals who compose the category of vulnerable victims.

The government argues that the "elderly" were particularly susceptible and vulnerable to the defendants' fraudulent schemes due to their age and their special financial needs. (Government Memo in Response to Revised Sentencing Notice, p. 3). In addition to age, the government articulates several other factors to identify the category of "elderly" vulnerable victims. Among these are: the "elderly" victims were more likely to have available funds to invest; they needed a faster return on their investment; and they were less likely to be able to recover from the fraud. The government maintains that the combination of these factors made the "elderly" unusually vulnerable to the defendants' schemes. (Government's Memo to Revised Notice, p. 3). The government further argues that the defendants operated at least three programs to entice the "elderly" to invest in their real estate partnerships. These included two retirement workshops and a piece of property in Hot Springs Arkansas called Diamondhead.[6] (Government's Memo in Response to Revised Notice, p. 4). According to the government, the ages of the victims who invested in the Diamondhead property made them susceptible to the defendants' promises of a retirement community with psychological and financial programs to ease them into retirement. (Government's Response Memo to Revised Sentencing Departure Notice, p. 5).[7]

Also in support of its argument the government has provided statistical information.[8] The statistical data is organized according to class member families. (Government Supplemental Sentencing Memorandum, p. 2). There were 3,300 individual class members. The 3,300 class members were divided into 1,750 class member families. These families consist of related investor victims, most often husbands and wives. The government provided an analysis of the birth date information for 2,500 of the total 3,300 victims in this case. The analysis reveals that at the time the fraud ended 1,415 (or 57%) of the 2,500 were age 50 or over. 727 of the 2,500 were age 60 or over.

As the defendants correctly point out, statistics can be misleading. The government has not provided any information on the essential facts upon which the court could find that these individuals were elderly at the time of their investments. The indictment alleges that the fraud commenced in January of 1980 and ended in 1988. Consequently, some of the investors who are included in the group of "elderly" victims could have been as young as 42 at the time of their investments. This illustrates the problem of identifying the vulnerable victims in this case and in what respects was this group more vulnerable than others who invested in the defendants' fraudulent schemes.

The defendants argue that the 2 point enhancement should not be applied because there is no evidence that the defendants "marketed securities to particular elderly persons based on knowledge of any mental o[r] physical disability of these potential investors, nor that the few solicitations directed at retirement investment related to

---

6. Through several radio advertisements the defendants promoted retirement planning workshops, euphemistically called "Operation Snowbird" and "Life After Work–A–New Beginning". The workshops purportedly offered a "psychological adjustment program, a physical adjustment program, and a financial program for retirees". (Government's Memo in Response to Revised Notice for Sentencing, p. 3).

7. The government relates the case of one 55 year-old woman, Ms. Fuhrman, who had to retire because of severe arthritis. Ms. Fuhrman

invested her paid-up annuity of $72,000 in Diamondhead. According to the government, Ms. Fuhrman, before investing, allegedly told the defendants about her special needs for security and for her health problems. (Government's Response Memo to Revised Sentencing Departure Notice, p. 5).

8. The statistical information was obtained from the receiver appointed for the class action suit that commenced against the defendants in April of 1988, in the Northern District of Illinois.

any of the fraudulent partnership offerings in which the defendants were involved." (Defendants' Response to Revised Notice, p. 3). The government's evidence, however, contradicts at least part of this assertion. Some of the defendants' solicitations involving the elderly were directed at retirement investment and did involve some of the fraudulent partnerships in which the defendants were involved. (Government's Response to Revised Notice, p. 4). One example noted was that of the Diamondhead property which was marketed as a retirement community (Government's Response, p. 4).

The defendants further maintain that targeting the elderly did not constitute a major portion of their fraudulent activity. The government has presented evidence that the defendants did know, at least in some cases, that certain victims were vulnerable due to age and physical condition by noting examples of elderly investors who communicated to the defendants their needs for solid investments due to the combined reasons of health problems and age. (Government's Response, p. 5–7). The evidence, however, does not suggest that the defendants targeted these individuals on the basis of these particular vulnerabilities. There also remains the question of whether these victims were "unusually" vulnerable. In *U.S. v. Moree,* 897 F.2d 1329, 1335 (5th Cir.1990) the court states:

> "the vulnerability that triggers § 3A1.1 must be an 'unusual' vulnerability which is present in only some of the victims of that type of crime. Otherwise the defendant's choice of likely victim does not show the extra measure of criminal depravity which § 3A1.1 intends to more severely punish."

The Seventh Circuit's recent opinion, *Sutherland,* supra, 955 F.2d 25, is instructive on the application of § 3A1.1. In that case, the defendant was convicted of conspiring to commit mail fraud on war veterans and their families. The facts were as follows: the defendant obtained membership rosters of veteran's organizations. He represented himself as a military historian, publisher, physician and author who was in the process of writing a book, in order to solicit war memorabilia from war veterans and their widows. Contrary to his promises that he would write a book and then return the items, the defendant did neither. Instead, he sold the items for personal gain. 955 F.2d at 26. The district court determined that the defendant's victims were unusually vulnerable because of their age and status as war veterans. 955 F.2d at 26. This decision was based on three grounds:

> (1) the court's calculation that World War I veterans would have been in their eighties when [the defendant] contacted them, and the World War II veterans would have been in their sixties or older;
> (2) a 'truism' stated by the court that judicial notice can be taken of the following statement: 'We tend to place greater emphasis as we get older upon those high points and mountain top experiences of our lives and recall with more reminiscence what took place and things become more significant to us.';
> (3) the court's conclusion that war veterans would be unusually susceptible to a fraud based on collecting and converting their personal war memorabilia.

955 F.2d at 26.

■ The court in *Sutherland* notes that § 3A1.1 is "designed to punish criminals who choose (emphasis) vulnerable victims, not criminals who target a broad group which may include some vulnerable persons." 955 F.2d at 26. Without evidence that the defendants "considered the age of the victims or that their age [sic] was a factor in the crime in any way", the *Sutherland* court concluded that, "there was insufficient support for applying the 2-point adjustment, even if the defendants targets had been 'uniformly old'". 955 F.2d at 27. The opinion in *Sutherland* also suggests that even if the district court had heard specific evidence regarding the vulnerability of the victims, an inquiry regarding whether their vulnerability was "unusual" within the meaning of § 3A1.1 may be required. 955 F.2d at 27 footnote 2. The court did not resolve the issue of whether the sentencing commission intended, in drafting the language of § 3A1.1,

that "aged persons" are to be considered "unusually vulnerable" as a matter of law. 955 F.2d at 27 footnote 2.

The age category in the *Sutherland* case was higher (i.e. individuals age 60 and above were "identified as the 'elderly' victims") than in the case before this court; the *Sutherland* court still found that there was insufficient evidence to conclude that the war veterans were vulnerable victims within the meaning of § 3A1.1.

In *United States v. Boult,* 905 F.2d 1137, 1140 (8th Cir.1990) a case in which the application of a § 3A1.1 enhancement was upheld, the victim's age, mental condition, small stature in comparison to the defrauder's and past associations with the defendants were all factors considered in determining the appropriateness of the enhancement. The evidence was sufficient there to find that the defendants targeted the victim in particular and exploited his unusual vulnerabilities. The facts in the case before this court are not so clear cut. Many different types of victims were attracted to the schemes of Boula and Gordon. The government has failed to provide sufficient evidence that every, or even any, victim over age 50 had unusual vulnerabilities and that the defendants targeted and exploited them on these bases. There is nothing unusual per se about a person having money to invest and finding it difficult to recoup his or her losses after having been the victim of fraud.

As the court in *Creech* noted, "it is logical to assume the intended victims of any premeditated offense will be selected because something in his or her persona or circumstances will make successful the intended criminal act." *Creech* at 782. Such factors, however, do not warrant the application of the § 3A1.1 enhancement.

The court concludes that there are a number of problems with applying the § 3A1.1 two-level enhancement to the defendants' sentences. Defining an age category is difficult, since all persons of age 50 are not vulnerable victims even if they should happen to fall prey to a fraudulent scheme. The government's statistical information does not indicate how old these "elderly" persons were when they made their investments. The vulnerable victim enhancement would not be appropriately applied simply because these individuals are in a category labelled "elderly" people.

The defendants have made a persuasive argument that the statistics proffered by the government demonstrate that the investors reflect a representative cross section of people of different age groups who were in a position financially to invest. (Defendants' Reply to Government's Statistics, p. 2). The government has also failed to sufficiently demonstrate that the additional factors which make these "elderly" persons a group of vulnerable victims were not present to the same degree or more in the other investors. The psychological mind-set, the desire for security, the need for more income to pay for medical costs could be factors which are attributable to other investors who were under age 50 at the time they invested in the defendants' properties.

This court cannot conclude that all the investors who were over age 50 at the time of their investments were unusually vulnerable due to "age, physical, or mental condition". In other words each "elderly" individual's susceptibility to the fraud may have been different and thus there is nothing to join them together as a group of vulnerable victims or to distinguish them as a group from the other victims of the defendants' schemes. Therefore, the court finds that the defendants did not target vulnerable victims within the meaning of § 3A1.1.

CONCLUSION

Absent the § 3A1.1 two point level enhancement, the defendants' offense level remains at 24. An offense level of 24 with a criminal history category of I corresponds to a sentencing range of 51 to 63 months, a range which this court sincerely believes is grossly below the appropriate sentence for a calculated crime involving such an enormous number of victims over such a random protracted period of time. The Sentencing Guidelines Commission has given more deference to the prosecutors,

and to the higher courts as it develops the law, than it gives to the trial court which in the history of common law has previously been able to structure, carve and apply with reasonable discretion the understanding and the knowledge obtained by listening firsthand to the evidence and the arguments. The Sentencing Commission's failure to take advantage of the observations and experience of the trial courts ignores the important role for which the courts were originally appointed under the Constitution.