**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marshall G. PETERS and Linda Peters,
Defendants–Appellants.**

**Nos. 91–50097, 91–50133.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 7, 1992.

Decided May 5, 1992.

H. Dean Steward, Maria G. Valdez, Deputy Federal Public Defenders, Santa Ana, Cal., for defendant-appellant Marshall G. Peters.

Jeffrey Liebowitz, Marina del Ray, Cal., for defendant-appellant Linda Peters.

Robert L. Brosio, Asst. U.S. Atty., Chief, Criminal Div., and Jeffrey B. Isaacs, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before WALLACE, Chief Judge, BROWNING, Circuit Judge, and JONES *, District Judge.

* Honorable Robert E. Jones, United States District Judge for the District of Oregon, sitting by designation.

ROBERT E. JONES, District Judge:

*Overview*

Marshall and Linda Peters appeal from the ruling of the United States District Court for the Central District of California. Marshall Peters appeals from his sentence following convictions for ten counts of mail fraud, 18 U.S.C. § 1341, and one count of using a fictitious name to carry out a scheme to defraud, 18 U.S.C. § 1342. Linda Peters appeals from her convictions of five counts of mail fraud, and from her sentence resulting from those convictions. The Peters were indicted and tried before a jury together. Their appeals are consolidated before this court.

*Facts*

In 1987, Marshall Peters contrived a scheme to defraud members of the public by soliciting funds for "pre-approved" credit cards from individuals having poor credit histories. In early 1988, Marshall Peters and his wife, Linda Peters, began doing business under the fictitious business name of "Credit America."

· The Peters operated Credit America from their home. To facilitate the scheme, Credit America purchased a mailing list from a mailing list brokerage firm. The list was called "Credit Problem Names" and gave the names and addresses of approximately 40,000 individuals having credit difficulties. Credit America then sent solicitation letters to at least 30,000 of the individuals on the list.

The solicitation letters represented, in relevant part, the following:

CONGRATULATIONS! You have been *pre-approved* to receive your very own CREDIT AMERICA Master-Card.... We have a MasterCard reserved for you right now, but you have to ... [complete] the enclosed *pre-approved* CREDIT AMERICA application, and [mail] it back to us with your annual $35.00 membership fee ... you *cannot* be turned down, because you are already pre-approved.... There is *NO* CATCH!

CREDIT AMERICA has made special arrangements for group approval with VISA and MasterCard, ... Your membership is backed by a *100% MONEY BACK SATISFACTION GUARANTEE,* ... your have nothing to lose, and *everything to gain.* To receive your CREDIT AMERICA MasterCard with *NO CREDIT CHECK* and *NO SECURITY DEPOSIT,* your pre-approved application and $35.00 annual membership fee must be received by CREDIT AMERICA within the next 30 days.

The letter was signed by "Preston Roberts, Vice–President, New Accounts," and displayed the VISA and MasterCard logos. In fact, there was no "Preston Roberts," or special arrangement with either MasterCard or VISA, nor were there any pre-approved bank cards. Credit America was not authorized to use the VISA and MasterCard logos, the Credit America address was a rented mailbox, and Preston Roberts was a fictitious name conjured up by Marshall Peters. In addition, the Credit America telephone number listed on the solicitations was connected only to an answering machine.

The Peters intended the solicitation to cause the targeted individuals to send in $35.00 to join Credit America in return for the promise of a pre-approved credit card. The scheme was a success in that over 5,500 such individuals responded to the solicitations, each of them sending in $35.00 and expecting a credit card. Although some individuals received an "acknowledgment" postcard or a "Membership Handbook" from Credit America, none of the recipients of the solicitation ever received a credit card.

The Peters, however, received in excess of $200,000 from the scheme before United States Postal Service Inspectors searched their home in October of 1988. The search resulted in the seizure of approximately 3,750 opened envelopes containing credit card applications from which the $35.00 application fee had been removed. The search also produced approximately 150 unopened complaint letters, approximately 700 opened complaint letters, and several handwritten notes recording card applicants' complaints left on the answering machine.

A federal grand jury indicted the Peters in May of 1990. The indictment charged Marshall Peters and Linda Peters with fourteen counts of mail fraud and Marshall Peters with one count of using a fictitious name to carry out a scheme to defraud. Subsequently, the government filed a redacted indictment removing four counts of mail fraud from the indictment.

The Peters pled not guilty and a jury trial commenced on October 16, 1990. The jury returned a verdict convicting Marshall Peters of ten counts of mail fraud and one count of using a fictitious name to carry out a scheme to defraud. The jury convicted Linda Peters of five counts of mail fraud, while acquitting her on five counts.

The district court judge sentenced the Peters as follows:

1) Marshall Peters to 46 months imprisonment, followed by three years of supervised release, based on the following:

    a) Base offense level for crimes of fraud and deceit, § 2F1.1(a) ................. 6

    b) Amount of loss between $200,001 and $500,000, § 2F1.1(b)(1)(H) ......... + 7

    c) Offense involved more than minimal planning and/or more than one victim, § 2F1.1(b)(2) ....... + 2

    d) Defendant knew or should have known that a victim of the offense was unusually vulnerable, § 3A1.1 ................. + 2

    e) Defendant was an organizer, leader, manager or supervisor of a criminal activity that involved less than five participants, § 3B1.1(c) ........ + 2

*Adjusted Offense Level* ...... 19
*Criminal History Category* ..................... III
*Guideline Range* ......... 37–46

2) Linda Peters to 28 months imprisonment, followed by three years of supervised release, based on the following:

a) Base offense level for crimes of fraud deceit, § 2F1.1(a) .......... 6

b) Amount of loss between $200,001 and $500,000, § 2F1.1(b)(1)(H) .......... + 7

c) Offense involved more than minimal planning and/or more than one victim, § 2F1.1(b)(2) ........ + 2

d) Defendant knew or should have known that a victim of the offense was unusually vulnerable, § 3A1.1 ................. + 2

*Adjusted Offense Level* ...... 17

*Criminal History Category* ....................... I

*Guideline Range* ......... 24–30

The district court also ordered the Peters to pay restitution to the victims of the Credit America scheme in the amount of $202,573.40.

On appeal, Linda Peters challenges both her conviction and sentence. Marshall Peters appeals only his sentence.

### Sufficiency of the Evidence

Linda Peters submits that there was insufficient evidence to support her convictions for mail fraud in violation of 18 U.S.C. § 1341.

█ In evaluating this claim, we review the record as a whole, in the light most favorable to the government. *United States v. Normandeau*, 800 F.2d 953, 959 (9th Cir.1986). All reasonable inferences supporting the conviction, including decisions regarding the credibility of witnesses, must be drawn. *United States v. Beecroft*, 608 F.2d 753, 756 (9th Cir.1979). We must affirm "[i]f we find that '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Normandeau*, 800 F.2d at 959 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)) (emphasis in original); *United States v. Adler*, 879 F.2d 491, 495 (9th Cir.1988).

█ In order to prove a violation of 18 U.S.C. § 1341, there must be a showing of a specific intent to defraud. *Beecroft*, 608 F.2d at 757. The intent to defraud may be inferred from a defendant's statements and conduct. *Id.; see e.g., United States v. Van Dyke*, 605 F.2d 220, 222–25 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979) (intent to defraud inferred from evidence, including the defendant's failure to respond to customer complaints); *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985) (intent to defraud inferred from evidence that defendant took steps to conceal illegal activities).

█ The evidence presented at trial, including her own testimony, showed that Linda Peters was aware of, and involved in, the operation of Credit America. The evidence showed that Linda Peters had personal knowledge of numerous complaints from individuals who had sent their $35.00 to Credit America expecting, but never receiving, a credit card. There was also evidence that Linda Peters continued to help her husband mail out solicitation letters, picked up mail, and deposited the fraudulently acquired $35.00 checks.

Obviously, the jury did not believe Linda Peters' claims of ignorance. The jury was entitled to infer from the evidence outlined above that Linda Peters was actively involved in Credit America and that she knew Credit America customers were being defrauded. There was sufficient evidence for a rational trier of fact to find Linda Peters guilty.

### Linda Peters' Degree of Participation

█ Linda Peters submits that the district court erred in finding that she was not a minor nor a minimal participant in the scheme. We review the district court's finding that Linda Peters was not a minor nor minimal participant under the clearly erroneous standard. *United States v. Lui*, 941 F.2d 844, 848–49 (9th Cir.1991); *United*

*States v. Sanchez–Lopez*, 879 F.2d 541, 557 (9th Cir.1989).

Linda Peters contends that the evidence shows her degree of participation was minimal or, at worst, minor. The district judge rejected this contention and found that the Peters were equal partners. The district judge found Linda Peters' claims of ignorance and noninvolvement implausible. The district judge also found that Linda Peters was a full principal who received economic benefit from the scheme.

The district judge's findings are supported by the record and are not clearly erroneous. The district court did not err in ruling that Linda Peters was not a minor nor minimal participant.[1]

### Marshall Peters' Role

Marshall Peters asserts that the district court erred when it increased his offense level pursuant to Guideline section 3B1.1(c), which provides for a two level increase upon a finding that the defendant was an "organizer, leader, manager or supervisor" of an offense involving less than five participants. We review the district court's finding for clear error. *United States v. Carvajal*, 905 F.2d 1292, 1295 (9th Cir.1990).

Marshall Peters first argues that the district court erred because it did not make specific findings to support its application of section 3B1.1(c). That argument is without merit. *See United States v. Rigby*, 896 F.2d 392, 394 (9th Cir.1990).

The record shows that the district court adopted the government's argument that the adjustment was warranted and that Marshall Peters had an opportunity to present evidence to the contrary. That is all that is required. *Id.*[2]

Marshall Peters next asserts that the district court's finding that Linda Peters was a co-equal partner precludes application of section 3B1.1. This argument also fails.

The court did not specifically find that the Peters were equal partners for all purposes in the Credit America scheme. The "finding" referred to by Marshall Peters was actually a remark made by the district judge while he was determining Linda Peters' level of responsibility. The district judge's comment regarding Linda Peters' level of involvement in the scheme does not preclude the finding that Marshall Peters was an organizer or leader. The evidence is clear that Marshall Peters concocted the scheme as an organizer and that Linda Peters helped carry it out as an equal partner.

The district court's determination that Marshall Peters was the organizer or leader of the Credit America scheme is supported by the record and was not clearly erroneous.

### Enhancement Based on Particular Susceptibility

Both Linda and Marshall Peters argue that the district court erred in adjusting their base offense levels upward under Guideline section 3A1.1 which provides for a two point enhancement if the victim of a crime is "particularly susceptible to the criminal conduct."

The standard of review of the district court's construction and interpretation of the Guidelines' section on victim-related adjustments is *de novo*. *United States v. Caterino*, 957 F.2d 681, 683 (9th

---

1. Linda Peters also argues that the evidence shows that her activity was less culpable than her husband and, therefore, she is entitled to the two level downward adjustment of a minor participant. This argument is without merit. A district judge is not required to make findings as to the relative culpability of a group of defendants. *United States v. Rexford*, 903 F.2d 1280, 1282 (9th Cir.1990). Moreover, simply because one participant's activity may be less culpable than one's co-participants does not require a finding of minor participant status. *United States v. Andrus*, 925 F.2d 335, 338 (9th Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 249, 116 L.Ed.2d 204 (1991).

2. As this court has noted in the past, the district court should make clear on the record its resolution of all disputed matters and, of course, specific findings of fact are encouraged. *Rigby*, 896 F.2d at 394.

Cir.1992). We review the district court's findings regarding the susceptibility of the victims for clear error. *Id.*

■ The Peters argue that merely because the victims of the Credit America scheme were selected from a list of individuals who had credit problems does not render those victims "unusually vulnerable" under section 3A1.1. The Peters concede that their poor credit histories may have made the victims more interested in the bogus solicitation, but contend that this situation only made the crime possible, and did not make the victims unusually vulnerable. *See United States v. Moree*, 897 F.2d 1329, 1335–36 (5th Cir.1990).[3] We do not agree.

Section 3A1.1 of the Guidelines provides:

§ 3A1.1. *Vulnerable Victim*

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

U.S.S.G. § 3A1.1

The language of section 3A1.1 distinguishes between unusual vulnerability due to the age, physical or mental condition of the victim, and the victim's particular susceptibility to the crime. This, we think, is not a distinction without a difference.

*Compare Moree*, 897 F.2d at 1336 (no adjustment to defendant's sentence where victim was not chosen because of any perceived unusual physical or mental problem). However, as we noted in *United States v. Skillman*, 922 F.2d 1370 (9th Cir.1990), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991), neither the Guidelines nor the Commentary offers a specific explanation or examples "relative to the victim 'that is particularly susceptible to the criminal conduct.' " *Id.* at 1377.[4]

When devising the Guidelines, the Sentencing Commission faced a dilemma as to whether to base sentences upon the actual conduct engaged in by the defendant regardless of the charges against him—so-called "real offense" sentencing, or upon the conduct that constitutes the elements of the offense—so-called "charge offense" sentencing. *See* United States Sentencing Commission, *Guidelines Manual*, Ch. 1 Pt. A, § 4(a), p. 4 (Nov. 1, 1991). The Commission eventually settled upon a methodology closer to the charge offense option, but retained several "important, commonly occurring real offense elements such as role in the offense, the presence of a gun, or the amount of money actually taken, through alternative base offense levels, specific offense characteristics, cross references, and adjustments." *Id.* at 5.

---

**3.** In *Moree,* the defendant offered to "fix" a criminal indictment pending against the victim in return for money. The defendant was convicted of obstruction of justice. The district court adjusted the sentence, finding that the victim was selected for the scam because of his unusual vulnerability and particular susceptibility due to the pending indictment. The Fifth Circuit reversed, finding that:

> [a] condition that occurs as a necessary prerequisite to the commission of a crime cannot constitute an enhancing factor under § 3A1.1. The vulnerability that triggers § 3A1.1 must be an "unusual" vulnerability which is present in only some victims of that type of crime. Otherwise, the defendant's choice of a likely victim does not show the extra measure of criminal depravity which § 3A1.1 intends to more severely punish ... Here, Moree's activities focused on [the victim] because he had previously indicted, not because of any perceived mental or physical vulnerability. [The victim] surely was put on the defensive by his

indictment, but he did not suffer from any unusual physical or mental problems ...
*Moree,* 897 F.2d at 1335–36.

**4.** The Commentary to section 3A1.1 provides:
*Application Notes:*
> 1. This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile.
> 2. Do not apply this adjustment if the offense guideline specifically incorporates this factor. For example, where the offense guideline provides an enhancement for the age of the victim, this guideline should not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

One of the real offense elements incorporated by the Commission is the section 3A1.1 victim-related adjustment at issue here. Thus, a reasonable interpretation of section 3A1.1, and one in keeping with the Guideline's stated policy to incorporate certain real offense elements, is that sentencing courts must consider certain of the characteristics of the victims of criminal conduct. Toward that end, section 3A1.1 specifically requires the sentencing court to determine if, based on the victim's age, mental or physical condition, the defendant knew or should have known that the victim was unusually vulnerable. Thus, adjustments based on the victim's unusual vulnerability turn solely on the victim's: (1) age—presumably his or her youth or elderliness; (2) mental condition; and (3) physical condition.

■■■■ The Guidelines do not, however, prescribe consideration of only those three factors. Section 3A1.1 goes on to ask if the defendant knew or should have known that a victim was "otherwise particularly susceptible to the criminal conduct." The addition of the "otherwise particularly susceptible" language requires the sentencing court to consider factors beyond the victim's age, physical and mental condition. The sentencing court must consider the characteristics of the defendant's chosen victim, the victim's reaction to the criminal conduct, and the circumstances surrounding the criminal act. The sentencing court must then determine whether the defendant could reasonably have anticipated the victim's reaction. *See Skillman,* 922 F.2d at 1378.

In *Skillman,* the defendant was convicted of burning a cross on the lawn of a black family. The district court found that a black family in a predominantly Caucasian neighborhood is particularly susceptible to a cross burning and that the defendant should have known of this particular susceptibility. *Id.; cf. United States v. Long,* 935 F.2d 1207, 1211–12 (11th Cir. 1991) (finding that under the totality of the circumstances, defendant should have known that a black family was "unusually vulnerable" to the crime of cross burning); *accord United States v. Greer,* 939 F.2d 1076, 1100 (5th Cir.), *reh'g en banc granted,* 948 F.2d 934 (5th Cir.1991) (upholding upward adjustment under § 3A1.1 where defendants targeted black, Hispanic, and Jewish citizens); *see also United States v. Jones,* 899 F.2d 1097, 1100 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990).

This court, in *Skillman,* upheld the district court's finding of particular susceptibility. *Skillman,* 922 F.2d at 1378. In so doing, this court focused on the certainty that the resulting impact of the crime of cross burning upon the specific victims could reasonably have been anticipated by the defendant.

This is an reaction reasonably to be anticipated from this criminal conduct. Skillman knew or should have known that a black family, such as the Heisser family, would be terrified and particularly susceptible to this criminal conduct. *Id.*

In the present case, the Peters sought out and targeted for their scheme only individuals whom they believed had poor credit histories. The district judge made specific findings in this respect which are supported by the record.[5] The solicitation

5. The district judge found:

I think that the victim-related adjustment in the guideline comes directly, and indeed I think that the legislative history suggests, that it is the public feeling that somebody has to pay attention to the victim, that the demand for retribution, if you will, that if you pick out a particularly vulnerable victim, that the crime is worse.

This particular victim—particular in my judgment—these victims were peculiarly susceptible to this solicitation.

If you haven't had credit problems, you'd throw this thing away, but if you had had credit problems, it was directed right to you. It was directed right at your state of mind, the victim's state of mind, which I believe is the one that's important.

\* \* \* \* \*

The same kind of pitch made to the general public might have found these people in it. It would have been a lot more expensive to find these people in a generalized solicitation of the general public, even though they'd have been in it.

letter sent out by Credit America used terms designed specifically to entice such individuals to respond. Ten victims of the Credit America scheme testified that they did have "credit problems," and that they responded to the Peter's solicitation because of difficulty or inability to obtain credit elsewhere.

As was the case in *Skillman*, this reaction by these victims could reasonably be anticipated to result from this criminal conduct. The Peters knew or should have known that individuals with poor credit backgrounds were more likely than others to succumb to the solicitation and were particularly susceptible to the scam. That, in fact, is precisely why the Peters targeted the solicitation at these individuals. The district court did not err in adjusting the Peters' sentence upward under section 3A1.1.

### Conclusion

Linda Peters' conviction and sentence are AFFIRMED. Marshall Peters' sentence is AFFIRMED.

But what this one was was a target, a deliberately chosen target of a segment of the public that would be peculiarly vulnerable to this kind of pitch. And that I think is the dispositive factor.
R.T. 36–38.