**UNITED STATES of America**

v.

**Barry MILLER, Marc Teller, Ashim Kapadia, Gary Dubin, Christopher Ross, and Alan Davis.**

**Crim. A. No. 94–337.**

United States District Court, E.D. Pennsylvania.

Dec. 6, 1994.

David M. Howard, Asst. U.S. Atty., Philadelphia, PA, for U.S.

Thomas A. Bergstrom, Philadelphia, PA, for Barry Miller.

Francis Recchuiti, Norristown, PA, for Marc Teller.

Joseph C. Santaguida, Philadelphia, PA, for Ashim Kapadia.

Robert E. Madden, Philadelphia, PA, for Gary Dubin.

Edward Reif, Philadelphia, PA, for Christopher Ross.

Donald C. Marino, Philadelphia, PA, for Alan Davis.

## MEMORANDUM

DALZELL, District Judge.

I. *Introduction* [1]

The defendants in this criminal action perpetrated a rather unusual form of wire fraud. In late 1992, defendants Barry Miller and Marc Teller formed Standup Communications ("Standup"). Standup bought at a discount and collected at a premium rejected credit card debt. Of all the kinds of debt they could have selected, Miller and Teller focused on telephone chat lines debt.[2] Of all the lines they could have selected—phone lines for sports, horoscopes, stock quotations, lottery numbers, celebrities—Miller and Teller chose phone sex lines.[3]

Miller and Teller assembled a team of telemarketers (among them defendants Ashim Kapadia, Gary Dubin, Christopher Ross, and Alan Davis) who would call the debtors and seek payment. From the beginning of the scheme, Standup's collectors would simply lie to the victims, trying to convince them that they had made more calls or had run up a higher bill than was true. If a victim balked, the collectors would resort to threats to tell the victims' spouses, families, and employers that they had used a phone sex line. The collectors might also threaten to reveal that a victim had used a gay chat line, regardless of whether that fact was true. Finally, Standup's collectors would make repeated and harassing phone calls to the victims, yelling and calling them degrading names such as pervert, deadbeat, or "chatboy".

The scheme was a spectacular success. Although some defendants dispute the exact figures, it appears from Standup's records that Standup took in roughly $3,800,000 on debt worth roughly $300,000. Secret Service analyses of Standup's computer records reveal the names of almost 20,000 debtors in three separate databases. The individual cases of fraud before us are quite dramatic. One victim, R.L., owed $5.94. Standup collected payment after payment from him, $2,345 in all. Another victim, D.M., paid Standup sums totalling over $11,000 on an original debt of $35.64.[4] The defendants

---

1. The facts in this section, and upon which we base our legal conclusions, are drawn from the uncontested paragraphs of defendants' presentence investigation reports.

2. From the record, it appears that some chat lines allow customers to enter a credit card number to pay for a call. Moreover, some chat lines allow a call to proceed even if the credit card company refuses to authorize payment for the call. Standup bought this latter type of debt from the chat line companies themselves (or from the companies' brokers).

3. One need only peruse the back pages of the *Welcomat*, a local Philadelphia weekly newspaper, to discover the cornucopia of sexual encounters one can have at the touch of 8-0-0. According to these advertisements, the cost of such an encounter ranges from $.99 to $3.99 per minute, with most above $2.00 per minute. *See, e.g.,* *Welcomat,* November 30, 1994, at 111–113.

4. Of course, the defendants used other techniques unrelated to the sexual aspect of the phone line. For example, they would tell the victim that the phone sex company charged a flat

have admitted that a victim's debt rarely exceeded forty dollars.

In September of this year, all six defendants pleaded guilty to two counts of wire fraud, 18 U.S.C. § 1343. This Memorandum addresses whether the facts of this case warrant a two-level enhancement of defendants' sentences pursuant to the application of United States Sentencing Guideline § 3A1.1. All six defendants have objected to the enhancement. We have concluded that the facts of this case do satisfy the guideline, and will overrule the defendants' objections.

II. *Legal Analysis*

■ Section 3A1.1 establishes a two-level enhancement

> [i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct....

U.S.S.G. § 3A1.1. On its face, the guideline creates two obvious inquiries, *i.e.*, into the defendant's state of mind and the victim's special qualities.[5] There is also a third important inquiry, less obvious from the language of the guideline but crucial in its interpretation: a court must also examine the criminal activity itself. Certain victims might be "particularly susceptible" to certain schemes, though not generally.[6] The nature of the scheme creates the connection between a defendant's actual or imputed knowledge and a victim's particular susceptibility. Defendants who create a scheme that selects certain kinds of victims either may actually

know—or may be charged with—the knowledge of the special qualities that their chosen scheme exploits.

■ Thus, we believe that the best approach for implementing this guideline would focus on the "totality of the circumstances", with special emphasis on the "victim's individual vulnerability". *United States v. Hershkowitz*, 968 F.2d 1503, 1506 (2d Cir. 1992). If the totality of the circumstances reveals "the extra measure of criminal depravity which § 3A1.1 intends to more severely punish",[7] *United States v. Moree*, 897 F.2d 1329, 1335–36 (5th Cir.1990), then enhancement under § 3A1.1 is proper. *See United States v. Astorri*, 923 F.2d 1052, 1055 (3d Cir.1991) (noting that the inquiry mandated by § 3A1.1 "inherently involve[s] factual determinations").

This three-step inquiry—into a victim's special qualities, a defendant's state of mind, and the nature of the scheme—comports with the policies of § 3A1.1 as well. In *United States v. Lallemand*, 989 F.2d 936, 940 (7th Cir.1993) (Posner, J.), the Seventh Circuit aptly described the two policies of § 3A1.1 as "practical" and "moralistic":

> [Section 3A1.1] appears to have a two-fold purpose. One, the practical, is to recognize the lower cost to the criminal of committing a crime against such a victim than against a victim of ordinary robustness. A vulnerable or susceptible victim is (1) less likely to defend himself, (2) less likely perhaps to be aware that he is a victim of crime, [and] (3) less likely to complain.... The guideline's other purpose, the moralistic, is to express society's outrage at crimi-

---

fee, or that the victim was mistaken in his belief of the amount of the charge for the call. Unlike, say, credit card users in restaurants, one does not take away a receipt from phone sex against which to measure the accuracy of the claimed debt.

5. This case implicates the second type of victim envisioned by § 3A1.1, *i.e.*, those who are "otherwise particularly susceptible to the criminal conduct".

6. *See, e.g., United States v. Salyer*, 893 F.2d 113, 116 (6th Cir.1989) ("Cancer patients are more likely than others to be victims of a bogus cancer cure.").

7. This language has been quoted with approval in several circuits and in district courts in the Third and Seventh Circuit. *See United States v. Rowe*, 999 F.2d 14, 17 (1st Cir.1993); *United States v. Hershkowitz*, 968 F.2d 1503, 1505 (2d Cir.1992); *United States v. Wilson*, 913 F.2d 136, 138 (4th Cir.1990); *United States v. Cree*, 915 F.2d 352, 354 (8th Cir.1990); *United States v. Peters*, 962 F.2d 1410, 1416 n. 3 (9th Cir.1992); *United States v. Creech*, 913 F.2d 780, 782 (10th Cir.1990); *United States v. Davis*, 967 F.2d 516, 524 (11th Cir.1992); *United States v. Jordan*, 734 F.Supp. 687, 688–89 (E.D.Pa.1990) (Katz, J.); *United States v. Boula*, 787 F.Supp. 819, 825 (N.D.Ill.1992), *aff'd in part and vacated in part on other grounds*, 997 F.2d 263 (7th Cir.1993).

nals who unsportingly prey on the weak, the defenseless.

*Id.* at 940.

The practical policy behind § 3A1.1 recognizes that criminals can dream, too, and that they will aspire to create the most successful criminal scheme they can. One way to improve the odds of success is to create a scheme that exploits victims' special qualities. Section 3A1.1 operates as a disincentive to this especially exploitative form of criminal activity; it channels budding criminals into crimes with less chance of success because the victims will more likely defend themselves or complain to authorities. The moralistic purpose behind § 3A1.1 recognizes the predatory unfairness of such exploitation.

At least one court of appeals has emphasized that a victim's particular susceptibility must be "unusual", *i.e.*, different from the general susceptibilities of the "class of persons to which the victim belonged." *United States v. Creech*, 913 F.2d 780, 782 (10th Cir.1990). In *Creech*, the defendant had targeted a recently married man and threatened to harm his new wife. The district court granted the enhancement, and the Tenth Circuit reversed, finding that a newlywed's concern for his spouse was not unusual when compared with married people generally:

> We may freely presume, at least as a generality, that most married persons would become agitated over a threat of harm directed to their spouses. Thus, in the absence of specific evidence to the contrary, such concern would not be "unusual" within the context of the guideline.

*Id.* at 782. The Seventh Circuit took a similar approach (though with a different outcome) in *Lallemand*, comparing married homosexuals who have sex with men to those husbands who cheat on their wives "in the usual way". *Lallemand*, 989 F.2d at 940; *see also id.* ("Blackmail victims are not all susceptible to the same degree. Some secrets are a good deal more painful than others."). Thus, application of § 3A1.1 in this case will necessarily involve comparing a class of debtors generally[8] to those whose debt the defendants here purchased.

■ We have little doubt that the victims of this case satisfy the text and purpose of § 3A1.1. It does not seem a stretch to conclude that many people who use phone sex lines will, unlike users of non-sex-related phone lines, have a particular desire to keep that use private. This conclusion is merely a corollary of the indisputable premise that matters regarding an individual's sexual identity are among the most intimate and private.

Moreover, the victims' use of the telephone in this case reveals a special desire for privacy. These victims chose a relatively anonymous method of sexual interaction; the only connection between a victim and the phone sex line was through the victim's use of his credit card. Finally, the victims' use of their credit cards to pay for their purchases evinces an even greater desire for privacy than those who might have billed the calls to their home or work phone numbers.

The facts of *Lallemand* are analogous to this case, in several respects. In *Lallemand*, the defendant "decided that blackmailing a married homosexual would be a good way of

---

**8.** The broadest definition of this class would probably include all credit card users whose card-related debt is overdue. The narrowest definition of this class would focus on consumers to whom institutions extended credit after a credit card company had rejected the card for payment. *See supra* note 2. We do not believe that the difference between the broad definition and the narrow definition would warrant a different conclusion in this case.

There is an interesting debate in the circuits over whether a district court may find that victims of a scheme are particularly susceptible or unusually vulnerable as a class, or whether a court must base its findings on an examination of individual victims. *Compare, e.g., United States*

*v. Brown*, 7 F.3d 1155, 1160 (5th Cir.1993) ("[T]he district court could have reasonably concluded that lonely, elderly widows, *as a group*, are more susceptible ... to this type of fraud.") *with United States v. Pavao*, 948 F.2d 74, 78–79 (1st Cir.1991) (Breyer, C.J.) ("[W]e should hesitate to say that anyone involved with drugs becomes *ipso facto* a 'vulnerable victim' of a crime like that of Pavao.") (citing cases). The text of § 3A1.1 and its commentary provide support for both propositions. Our Court of Appeals has not yet faced this issue, nor need we in this case. The defendants' treatment of the victims generally, and their continued dunning of R.L. and D.M., satisfy either test.

raising money to help defray the expenses of his wife's pregnancy." *Lallemand,* 989 F.2d at 937. Lallemand lured a married gay man back to his house, had sex with him, and videotaped the proceedings. He then blackmailed the victim of his scheme by threatening to reveal his homosexuality to the victims' wife, employers, friends, and children. *Id.* at 937. The Seventh Circuit found that the district court properly granted the enhancement. *Id.* at 940. Judge Posner noted that "[s]ecrets concerning sexual behavior are among the secrets that people often want very much to conceal." *Id.* at 939. He concluded:

> To hound a person furtively engaged in sexual activities that he, his wife, his children, his parents, and his friends may consider deeply shameful, disgraceful, [or] abnormal ... is to exploit a position of unusual leverage in relation to one's victim that deserves recognition in sentencing.

*Id.* at 940.

It is true, as defendants have argued, that the use of a phone sex line is not illegal. There is also more than a little merit in the contention that in modern culture there is—or should be [9]—little shame in talking frankly about sex, or in admitting to the use of phone sex lines. We think these propositions miss the point. We are far from sure that, even today, a husband would be irrational in trying to prevent his wife or his employer from learning that he uses a phone sex line. Even though use of the line is perfectly legal, users of phone sex lines are, we think, particularly susceptible to preying defendants who threaten to destroy their intimate relationships, their jobs, and their reputations.

Second, the nature of this scheme exploited these victims' particular susceptibilities. The lies, the threats, and the name-calling and cajoling were present from the beginning of the scheme, and these techniques all exploited the very concerns that a user of these services might have.[10] And it worked. The defendants collected roughly $3,800,000 on about $300,000 in actual debt. R.L.'s and D.M.'s individual cases present even more dramatic ratios.

Finally, the defendants' practices satisfy the knowledge element of § 3A1.1. The purchase of only phone sex debt reveals, at least, knowledge of the desire for privacy in sexual matters, and a hunch that the desire for privacy could be exploited. Even if defendants [11] did not actually know individual victims who might be particularly susceptible, the rapid success of the scheme showed the defendants that their hunch was right. As their dealings with R.L. and D.M. confirm, when Standup found a responsive victim, they returned to the well time and time again. The defendants knew or should have known that their victims would be less likely to complain to family, friends, or the police, and would be less likely to defend themselves against the bogus amounts demanded from them.[12] *See Lallemand,* 989 F.2d 936, 940.

Unfortunately, the Third Circuit has not interpreted § 3A1.1 in detail. Section 3A1.1

---

9. *See, e.g.,* Richard A. Posner, *Sex and Reason* 181–219, 334 (1992) (arguing for a model of "morally indifferent sex", *i.e.,* that "sex ought to be a morally indifferent matter, like eating"). Indeed, an economic perspective like Judge Posner's would view phone sex favorably. The potential economic costs of this type of consensual sexual interaction—disease, pregnancy, coercion, and "search costs"—are low. *See id.* at 115–42.

10. Consider the odds of success if the defendants had purchased debt from, say, Sears. Would threats to reveal the failure to pay for a lawnmower or refrigerator elicit the exorbitant payments received in this case?

11. The scheme was, in fact, the brainchild of defendants Miller and Teller.

12. We believe that the facts of that case satisfy a finding of intent to exploit victims' particular susceptibilities. The courts of appeals are currently split on the issue of whether intent is an element of § 3A1.1. *Compare, e.g., United States v. Callaway,* 943 F.2d 29, 31 (8th Cir.1991) (holding that a defendant must choose his victim "as a 'target' " for § 3A1.1 to apply); *United States v. Sutherland,* 955 F.2d 25, 28 (7th Cir.1992) (same) *with United States v. White,* 974 F.2d 1135, 1140 (9th Cir.1992) (stating in dictum that intent is not an element of § 3A1.1). The Third Circuit has not addressed the issue, but we agree with Judge Ditter that such a requirement is not consistent with the plain language of the guideline. *See United States v. Carroll,* 1993 WL 134762, at *2 (E.D.Pa. April 14, 1993), *aff'd without op.,* 17 F.3d 1431 (3d Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 100, 130 L.Ed.2d 49 (1994).

has been an issue in only two cases, *United States v. Seligsohn*, 981 F.2d 1418 (3d Cir. 1993), and *United States v. Astorri*, 923 F.2d 1052 (3d Cir.1991). In *Seligsohn*, the district court had granted the two-level enhancement, and the Circuit merely concluded that the district court's determination was not clearly erroneous. *Seligsohn*, 981 F.2d at 1426.[13] In *Astorri*, the Circuit deferred to the district court's enhancement because of the "inherent[ ] . . . factual determinations" that § 3A1.1 requires.[14] *Astorri*, 923 F.2d at 1055.

 *Seligsohn* and *Astorri* tell us that as long as at least one of the victims falls within § 3A1.1, then the Court may grant the enhancement. *Accord United States v. Caterino*, 957 F.2d 681 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 129, 121 L.Ed.2d 83 (1992). In both cases, the scheme involved many more people than those upon whom the Court based the enhancement. Thus, even if some of the victims in this case were not particularly susceptible to the crime, this fact would not in itself vitiate a § 3A1.1 enhancement.

Both *Seligsohn* and *Astorri* are arguably different from this case in one important respect. In both cases, the defendants met their victims through in-person solicitation. Our Court of Appeals has not yet addressed a case like the scheme here, in which the victims were selected anonymously as a batch (through the purchase of the debt) rather than individually.

*United States v. Peters*, 962 F.2d 1410 (9th Cir.1992), was such a case. In *Peters*, the defendants bought the names and addresses of 40,000 people with credit problems. They then mailed out a solicitation for a bogus pre-approved credit card. The solicitation told the victims that they would receive the card if they mailed in a $35.00 membership fee. The defendants defrauded 5,500 people of roughly $200,000. *Id.* at 1412–13. The district court granted an enhancement. *Id.* at 1415.[15]

The Ninth Circuit affirmed. *Id.* at 1418. The Court of Appeals noted that the solicitation (1) targeted people with poor credit history and (2) "used terms designed specifically to entice such individuals to respond" to the scheme. *Id.* at 1417–18. The court concluded:

> The [defendants] knew or should have known that individuals with poor credit backgrounds were more likely than others to succumb to the solicitation and were particularly susceptible to the scam. *That, in fact, is precisely why the Peters targeted the solicitation at these individuals.*

*Id.* at 1418 (emphasis added).

We find the reasoning of the Ninth Circuit persuasive. The defendants knew only one salient fact about their potential victims when they purchased the debt at issue here: their potential victims had used phone sex lines. From the universe of debtors, the defendants selected a particular type of debtor with a particular type of bad debt. They then created an elaborate scheme that focused directly on these special qualities and reaped a rich and unlawful harvest from it.

### III. *Conclusion*

We have concluded that the facts of this case warrants application of § 3A1.1 to these six defendants' sentences, and we therefore will overrule defendants' objections to the enhancement.

---

**13.** The scheme in *Seligsohn* involved fraudulent roofing repairs. The defendants would tell the victims that their roofs needed major repairs. Many of these defendants were elderly or disabled and could not verify the need for repairs. *Id.* at 1420.

**14.** In *Astorri*, a stockbroker defrauded investors, including his girlfriend's parents. *Id.* at 1054. The Court found that the relationship between the broker and the girlfriend—which included a promise to marry the girlfriend—made the parents particularly susceptible to the scheme. *Id.* at 1055.

**15.** The district court found:

> If you haven't had credit problems, you'd throw this thing away, but if you had had credit problems, it was directed right to you. It was directed right at your state of mind, the victim's state of mind, which I believe is the one that's important.

*Peters*, 962 F.2d at 1417 n. 5.