**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Thomas M. O'BRIEN, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Edward B. GALLUP, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patrick W. LYON, Defendant–Appellant.**

**Nos. 93–30287, 93–30297 and 93–30299.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted as to Defendant–
Appellant Gallup Oct. 3, 1994.

Submitted * as to Defendants–Appellants
O'Brien and Lyon Oct. 3, 1994.

Decided March 23, 1995.

---

* The panel unanimously agrees that this case as to

Defendants–Appellants O'Brien and Lyon is ap-

propriate for submission without oral argument.    Fed.R.App.P. 34(a);  9th Cir.R. 34–4.

James M. Roe, Seattle, WA, for defendant-appellant Gallup.

Lynn M. Reilly, Stoel, Rives, Boley, Jones & Grey, Seattle, WA, for defendant-appellant O'Brien.

Frederick D. Leatherman, Jr., Seattle, WA, for defendant-appellant Lyon.

Louis M. Fisher, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee.

Before: WOOD, Jr.**, HUG, and TANG, Circuit Judges.

TANG, Senior Circuit Judge:

Thomas M. O'Brien, Edward B. Gallup, and Patrick W. Lyon appeal the district court's imposition of a two-level enhancement of their sentences based on victim vulnerability under United States Sentencing Guidelines ("U.S.S.G.") § 3A1.1. A jury had convicted appellants on charges of conspiracy, mail fraud, wire fraud, interstate transmission of money obtained by fraud, and money laundering in connection with their operation of a fraudulent health insurance scheme. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I. BACKGROUND

Appellants sold underfunded health insurance to employer associations and misrepresented that the health plan was backed by a legitimate insurance carrier. Several of the employer associations to whom appellants sold insurance were not able to find health insurance elsewhere because of their members' ages and poor health.

Appellants' plan consisted of a trustee who theoretically held sufficient premium dollars from a given group of insured individuals to self-insure all the claims up to a $50,000 limit. Any claim above that limit was supposed to be covered by a stop-loss policy from a nationally known insurance company. The stop-loss insurance company would, in turn, reinsure their limited risk with a reinsurance company to spread the overall risk.

In May, 1987 Gallup secured Life Insurance Company of North America ("LINA"), a nationally recognized insurance company, as the stop-loss insurance company for a group health insurance plan known as the GRIP plan. Gallup vigorously promoted the GRIP plan to several employer associations. On May 1, 1988, however, LINA terminated the contract on the GRIP plan. No contract with any known insurance company existed in the interim until February 1, 1989, when Continental Insurance accepted.

During this interim period, appellants falsely represented the existence of a nationally known insurance firm offering stop-loss coverage, when, in fact, there was none. The only stop-loss carrier at this time was appellants' own Arizona Life Reinsurance Company, Inc. ("ALRI"). Gallup was president, O'Brien was vice president, and Lyon was chief financial officer of ALRI. As a reinsurance company, however, ALRI did not have authority to write primary or direct insurance in any state, and therefore it could not lawfully offer stop-loss coverage. In addition, ALRI was a shell company with only $100,000 in assets. Between May 1988 and June 1989, ALRI received $6.6 million in premiums, but paid out only $3.4 million in claims. Gallup diverted $807,000 of the premium money to his own use, while O'Brien received $180,000 and Lyon received $144,000. When individual claimants complained that their medical claims were not being paid, appellants often stalled and gave claimants "the run-around." Appellants' scheme ended in May 1989 when Continental Insurance went into conservatorship and the State of Washington Insurance Commissioner issued a cease and desist order.

After a complex five-week trial, a jury convicted appellants on numerous criminal

** Honorable Harlington Wood, Jr., Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.

charges stemming from their role in operating the fraudulent health insurance scheme. At sentencing, the district court found that the victims were vulnerable and applied a two-level enhancement for vulnerable victims under U.S.S.G. § 3A1.1. The district court sentenced Gallup to 97 months of imprisonment, to be followed by five years of supervised release; O'Brien to 60 months of imprisonment, to be followed by three years of supervised release; and Lyon to 51 months of imprisonment, to be followed by three years of supervised release.[1] Appellants appeal the district court's imposition of the two-level vulnerable victim enhancement to their sentences.

## II. STANDARDS OF REVIEW

We review *de novo* the district court's "construction and interpretation of the Guidelines' section on victim-related adjustments." *United States v. Peters,* 962 F.2d 1410, 1415–16 (9th Cir.1992) (citation omitted). We review *de novo* the district court's "application of the Sentencing Guidelines," but "findings of fact under them for clear error." *United States v. Myers,* 993 F.2d 713, 714 (9th Cir.1993).

## III. DISCUSSION

U.S.S.G. § 3A1.1 states:

If the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels.

The district court applied § 3A1.1 based on the following rationale: "[L]et me make it clear what my holding is. It is not that [Gallup, O'Brien, and Lyon] began with a plan of vulnerable victims. It's that after they found out victims were vulnerable and they could not pay those claims, they continued to accept premiums from people who had not had claims paid but were afraid not to

keep making their premium payments for fear they wouldn't be covered."

Appellants contend the district court erred for two reasons.[2] First, appellants argue that § 3A1.1 only applies where defendants "target" vulnerable victims. Appellants argue they did not specifically target individuals who developed medical problems and could not then get their claims paid. Second, appellants' contend that these victims were not "unusually vulnerable" under § 3A1.1. Appellants argue that individuals who developed medical problems and could not get their claims paid are no more unusually vulnerable than other victims of health insurance fraud. We address each argument in turn.

### A. Whether U.S.S.G. § 3A1.1 requires that a defendant "target" vulnerable victims

In arguing that § 3A1.1 only applies where a defendant "targets" vulnerable victims, appellants rely on the commentary to § 3A1.1. The commentary states:

This adjustment applies to offenses where an unusually vulnerable victim is made a target of criminal activity by the defendant. The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective cancer cure or in a robbery where the defendant selected a handicapped victim. But it would not apply in a case where the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

U.S.S.G. § 3A1.1, comment. (n. 1). Unlike the text of § 3A1.1, which requires that the defendant "knew or should have known that a victim ... was otherwise particularly susceptible to the criminal conduct," the commentary states that § 3A1.1 "applies to offenses where an unusually vulnerable victim

---

1. The district court also ordered appellants to make restitution of $6,100,000.

2. Appellants also argue they did not begin with a plan of vulnerable victims. The district court,

however, rested its holding on an entirely different ground—that the victims became vulnerable once they developed medical problems and could not get their claims paid.

*is made a target* of criminal activity by the defendant." U.S.S.G. § 3A1.1, comment. (n. 1) (emphasis added). The commentary thus appears to require more than just actual or constructive knowledge—the commentary suggests that the defendant must have an actual intent to "target" a vulnerable victim before § 3A1.1 can apply.

In support of this interpretation, appellants rely chiefly on *United States v. Rowe*, 999 F.2d 14 (1st Cir.1993), a First Circuit case with similar facts. In *Rowe*, the defendant pleaded guilty to criminal charges stemming from his role in a fraudulent health insurance scheme whose victims were a number of small businesses and their employees. *Id.* at 14–15. Rowe and others involved in the scheme mismanaged the operation, converted plan assets, and falsely represented that the health insurance plan was "approved" by the United States Department of Labor. *Id.* at 16.

The government in *Rowe* argued the vulnerable victim enhancement applied because, *inter alia*, "individual employees were rendered vulnerable once they developed medical problems because they then faced the choice of either continuing their payments to Rowe's plan, despite its nonpayment or delayed payment of their medical bills, or else possibly losing their health insurance." *Id.* The First Circuit rejected this contention, stating:

> Although individuals who became ill after the insurance was sold were hardly a special target of Rowe's initial solicitations, it may be that their subsequent inability to switch plans contributed in some manner to his profits.

> But in this case the thrust of the wrongdoing with which Rowe was charged was the initial fraudulent solicitations and the mismanagement or looting of the plan's assets. The near certainty that some of the subscribers would be more enmeshed than others appears to have been a collateral aspect of the wrongdoing. Indeed,

the situation is rather close to the case in which a fraud is aimed at the general public and some of the victims are senile or otherwise unusually susceptible. Yet in that instance the guideline commentary expressly precludes an enhancement, ... presumably because there is no special targeting of such victims and the added impact is incidental.

*Id.* at 17. *Rowe* thus stands for the proposition that the commentary to § 3A1.1 requires the defendant to "target" vulnerable victims before § 3A1.1 applies.

■ We decline to adopt the First Circuit's interpretation of § 3A1.1 and its associated commentary.[3] The requirement that the defendant must target the vulnerable victim is inconsistent with the plain language of § 3A1.1, which only requires that the defendant "should have known" that the victim was vulnerable. Although sentencing guidelines commentary is binding on the federal courts, we cannot apply an interpretation of the commentary that is "inconsistent" with the text of the guidelines section. *Stinson v. United States*, — U.S. —, — – —, 113 S.Ct. 1913, 1918–19, 123 L.Ed.2d 598 (1993).

■ We have, however, previously reconciled the commentary with the text of § 3A1.1. In *United States v. Caterino*, 957 F.2d 681, 683 (9th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 129, 121 L.Ed.2d 83 (1992), we applied § 3A1.1 even though the defendant did not target or "single out" vulnerable victims for harm. We explained in *Caterino* that the commentary's language has a limited purpose—"to exclude those cases where defendants do not know they are dealing with a vulnerable person." *Id.* at 683. We noted that this reading renders the commentary's language "consistent with the 'should have known' language" of the text of § 3A1.1. *Id.; see also* John Garry, Note. *"Why Me?": Application and Misapplication of § 3A1.1, the "Vulnerable Victim" En-*

---

3. We note that our reading of § 3A1.1 places us in conflict with several other circuits as well. *See United States v. Smith*, 39 F.3d 119, 123 (6th Cir.1994) (noting that "most circuits," including the Fourth, Sixth, and Eighth circuits "require that the defendant have actually targeted the

victims because of their vulnerability"); *see also Project, Twenty–Third Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1992–1993*, 82 Geo.L.J. 1153, 1154 n. 2160 (1994) (surveying federal circuit courts' applications of § 3A1.1).

*hancement of the Federal Sentencing Guidelines,* 79 Cornell L.Rev. 143, 175 (1993) ("The Ninth Circuit's reading of the [vulnerable victim] enhancement is consonant with its plain language and renders the guideline internally consistent.").

In *United States v. Boise,* 916 F.2d 497, 506 (9th Cir.1990), *cert. denied,* 500 U.S. 934, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991), we specifically rejected the argument that § 3A1.1 requires a defendant to select a victim intentionally because of his vulnerability. In *Boise,* the district court enhanced defendant's sentence because he murdered his six-week old son, a vulnerable victim. On appeal, this court held that "Boise's son was a vulnerable victim for purposes of adjusting the base offense level because a six-week old infant is 'unusually vulnerable due to age,' not because Boise selected him because of his vulnerability." *Id.* at 506.

■ Thus, under both *Boise* and *Caterino,* the defendant need not "target" a vulnerable victim in order for § 3A1.1 to apply. It is enough that appellants continued to accept premiums from vulnerable claimants which they "knew or should have known" were not getting their claims paid. Here, appellants personally talked to and engaged in stalling tactics with individual claimants who complained about unpaid medical claims. Appellants thus knew, or at the very least "should have known," that many vulnerable victims were not getting their claims paid, and yet appellants continued to accept premiums from them. Appellants' actual or constructive knowledge is therefore sufficient to trigger § 3A1.1.

## B. Whether the victims were "unusually vulnerable" under § 3A1.1.

Appellants' second argument is that the victims were not "unusually vulnerable" under § 3A1.1. Appellants contend that individuals who developed medical problems and could not get their claims paid are no more unusually vulnerable than other victims of health insurance fraud. In support of their argument, appellants rely again on *United States v. Rowe,* 999 F.2d at 17, and on *United States v. Moree,* 897 F.2d 1329 (5th Cir.1990). In *Rowe,* the court agreed that individuals

"who later developed medical conditions ... had more than the usual incentive to continue paying their premiums." 999 F.2d at 17. Nevertheless, the court declined to apply § 3A1.1 because "the thrust of the wrongdoing with which Rowe was charged was the initial fraudulent solicitations and the mismanagement or looting of the plan's assets." *Id.* The court reasoned that "[t]he near certainty that some of the subscribers would be more enmeshed than others appears to have been a collateral aspect of the wrongdoing," and thus there was "no special targeting of such victims and the added impact is incidental." *Id.*

■ We find the *Rowe* court's reasoning inconsistent with the plain meaning of § 3A1.1. Section § 3A1.1 states that a victim can be "unusually vulnerable due to age, [or] physical or mental condition," or "otherwise particularly susceptible to the criminal conduct." Here, individuals who developed medical problems and then could not get their claims paid fulfill both the unusually vulnerable "physical or mental condition" and the "otherwise particularly susceptible" criteria of § 3A1.1. Several of the victims had serious physical or mental conditions that required follow-up care. These individuals realistically could not have switched insurance companies—they were at the mercy of the appellants. One victim, for instance, needed three surgeries, of which one was temporarily postponed because ALRI denied coverage and failed to pay his claims.

Appellants argue, however, that applying § 3A1.1 in this instance would mean virtually every defendant who is convicted of a crime involving health insurance fraud would be subject to a vulnerable victim adjustment. Appellants cite *Moree* for the proposition that

the vulnerability that triggers § 3A1.1 must be an "unusual" vulnerability which is present in only some victims of that type of crime. Otherwise, the defendant's choice of a likely victim does not show the extra measure of criminal depravity which § 3A1.1 intends to more severely punish.

*Moree,* 897 F.2d at 1335.

We disagree with appellants' initial assumption that under our reading of § 3A1.1,

all defendants convicted of health insurance fraud would be subject to an upward adjustment. It is not difficult to imagine a health insurance fraud scheme in which the defendants simply took the money and ran—i.e., the defendants did not pay for the victim's medical claims, but nevertheless did not accept more premium money from the victims. In that instance, the victims of the health insurance fraud would not be unusually vulnerable victims. Here, however, the victims were unusually vulnerable and particularly susceptible once they developed medical conditions, accrued outstanding medical bills, and in some cases needed further treatment—these victims felt compelled to continue paying their premiums in order to avoid losing coverage.

■■■ We also disagree with the *Moree* court's restrictive reading of § 3A1.1. The plain language of § 3A1.1 does not contain a requirement that the vulnerability must be present in only "some victims of that type of crime." Moreover, the commentary to § 3A1.1 expressly anticipates application of § 3A1.1 in instances "where the defendant marketed an ineffective cancer cure." U.S.S.G. § 3A1.1, comment. (n. 1). The Fifth Circuit, in a case decided after *Moree*, noted that nowhere in the cancer example

> does it state that any individual victim purchasing such a cure must be unusually vulnerable beyond the fact that he has cancer and is seeking a cure. In other words, the Guidelines deem cancer patients, as a group, to be unusually vulnerable *vis a vis* the general public to snake oil salesmen promising cancer cures.

*United States v. Brown,* 7 F.3d 1155, 1161 n. 3 (5th Cir.1993). Here, victims who developed medical conditions and could not get their claims paid are, as a group, unusually vulnerable to appellants' continued acceptance of premiums and appellants' promises of payment.

Our reasoning, which rejects appellants' invitation to apply both *Rowe* and *Moree,* is consistent with *United States v. Peters,* 962 F.2d 1410 (9th Cir.1992). In *Peters,* the defendants engaged in a fraudulent fake credit card scheme in which they sent solicitations to 30,000 individuals listed on a mail-

ing list entitled, "Credit Problem Names." *Id.* at 1412. All 30,000 victims were deemed vulnerable victims. The court held that "[t]he Peters knew or should have known that individuals with poor credit backgrounds were more likely than others to succumb to the solicitation and were particularly susceptible to the scam." *Id.* at 1418. Similarly here, appellants knew or should have known that individuals who developed medical problems were more likely than others to succumb to appellants' continued acceptance of their premiums and were particularly susceptible to appellants' continued promises of payment.

We emphasize that appellants in this case did more than just fail to pay for the victims' medical claims. Appellants continued to accept premiums from these victims, many of whom were "afraid not to keep making their premium payments for fear they wouldn't be covered." It is this continual fraud perpetrated upon these victims—who became vulnerable once they developed medical conditions, had outstanding medical bills, and in some cases needed further treatment—that triggered § 3A1.1.

AFFIRMED.