81 F.3d 484
 UNITED STATES of America, Plaintiff-Appellee,
v.
John Maurice HENOUD, a/k/a V.J. Gupta, a/k/a Jerry Davis,
a/k/a Alex Reyes, a/k/a Jay Chapman, a/k/a J.D. Chapman,
a/k/a Jefferey Berg, a/k/a Gerry Davison, a/k/a Gerry G.
Davidson, a/k/a Jerry M. Davidson, a/k/a Jerry G. Davidson,
Defendant-Appellant.
 No. 94-5936.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 1, 1996.
Decided April 18, 1996.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk; J. Calvitt Clarke, Jr., Senior District Judge. (CR-92-183-N).
 ARGUED: Henry Kowalchick, Norfolk, Virginia, for Appellant. George Maralan Kelley, III, Assistant United States Attorney, Norfolk, Virginia, for Appellee. ON BRIEF: Helen F. Fahey, United States Attorney, Norfolk, Virginia, for Appellee.
 Before WIDENER and MURNAGHAN, Circuit Judges, and SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation.
 Affirmed by published opinion. Judge MURNAGHAN wrote the opinion, in which Judge WIDENER and Judge SPENCER joined.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 Appellant, John Maurice Henoud, was convicted of conspiracy and fraud in connection with an overseas call-selling scheme and ordered to pay restitution to the local and long-distance telephone companies he defrauded. He has challenged the district court's order of restitution contending that it improperly requires him to pay certain companies not named in the indictment and an amount in excess of that alleged in the indictment. He has also argued that the evidence was insufficient to warrant the sum awarded. Because we find no merit in Henoud's claims, we affirm the district court's order.
 
 I.
 
 2
 On October 20, 1992, a federal grand jury in Norfolk, Virginia, returned a 14-count indictment against Henoud, charging that he had established and operated an overseas call-selling scheme, known as an "Amigo scam,"[1] from an office at Parliament Drive in Virginia Beach. The scheme involved the order and installation of a five-line telephone service to that location on September 16, 1992, and the use of those lines to place overseas calls from September 22 to September 25, 1992.
 
 
 3
 A federal jury convicted Henoud of all counts on March 5, 1993.[2] At sentencing, Henoud acknowledged his liability for the toll fees incurred at the office, promised to pay those charges, and twice stipulated to the amount of loss as $24,442.53.[3] On May 18, 1993, the district court ordered that, as part of his sentence, Henoud pay restitution to the local telephone company, Chesapeake and Potomac Telephone Company ("C & P"),[4] and four long-distance carriers--AT & T, Sprint, Metro Media and Allnet--in the amount of $24,338.23.[5] Henoud appealed the restitution order chiefly on the basis that the court failed to consider his financial condition and ability to pay the amount awarded. He did not challenge, either in his brief or at oral argument, the district court's identification of the victims of the fraud or its determination of the amount due.
 
 
 4
 In July 1994, we rejected all of Henoud's arguments and affirmed his convictions and sentence, except for the amount of restitution owed. Because we noted inconsistencies in the record as to the amounts of restitution due each victim, we vacated the restitution order and remanded "for a determination of the restitution amount actually owed." United States v. Henoud, No. 93-5418, 1994 WL 369485, at * 7 (4th Cir. July 15, 1994) (per curiam) (unpublished).
 
 
 5
 On remand, the district court held an evidentiary hearing. There, for the first time, Henoud argued that the court should not count C & P as a victim in its restitution order because the company was not so labelled in the indictment. The United States presented evidence pertaining to the amount of loss through the testimony of Mary S. Coulsting, a C & P security officer and former service representative.[6] Coulsting testified that C & P billed subscribers for local services it provided, as well as for services supplied by long-distance carriers. Thus, C & P acted as both a billing agent and a collection agent for the long-distance carriers providing services to the subscriber. Coulsting explained that each long-distance company whose services the subscriber used reported its billing information to C & P, which then prepared the final bill. Because C & Ps billing cycle for the Parliament Drive office was on the fourth day of the month but each long-distance carrier had a different schedule, each monthly bill C & P prepared for that location did not necessarily contain charges for all calls made prior to that time.[7] Therefore, three C & P bills--dated October 4, November 4, and November 25, 1992--contained all long-distance calls and charges incurred at the Parliament Drive office during the period of the scheme. The bills included charges for services provided by AT & T, Sprint, Metro Media and Allnet, as well as fees for C & P services.
 
 
 6
 Because of slight discrepancies between Coulsting's trial testimony as to the amount charged and the actual sums as they appeared on the bills themselves, the United States stipulated at the remand hearing that it would be bound by the lowest figure for which any testimony appeared. After considering post-hearing briefs filed by the parties, the district court issued a written memorandum on December 1, 1994, ordering Henoud to pay restitution in the amount of $24,032.22 to C & P, AT & T, Sprint, Metro Media and Allnet. Henoud filed a timely notice of appeal to this court.
 
 II.
 A. Restitution Order
 
 7
 In general, criminal restitution orders should not be overturned in the absence of an abuse of discretion. United States v. Hoyle, 33 F.3d 415, 420 (4th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 949, 130 L.Ed.2d 892 (1995); United States v. Bailey, 975 F.2d 1028, 1031 (4th Cir.1992). We have repeatedly observed that a trial court's discretion in ordering restitution "is circumscribed by the procedural and substantive protections" in the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663, 3664. Bailey, 975 F.2d at 1031; United States v. Bruchey, 810 F.2d 456, 458 (4th Cir.1987). Here, Henoud has challenged the restitution order both as to the victims named and the amount awarded. We must review each aspect of the district court's order for an abuse of discretion.[8] Bailey, 975 F.2d at 1033.
 
 
 8
 Under the VWPA, a district court may order a convicted criminal to pay restitution to "any victim" of his offense. 18 U.S.C. § 3663(a)(1). In determining the amount of restitution to be paid, the court "shall consider the amount of the loss sustained by any victim as a result of the offense ... and other factors as the court deems appropriate." 18 U.S.C. § 3664(a). In general, restitution pursuant to the VWPA is permissible "only for the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413, 110 S.Ct. 1979, 1981, 109 L.Ed.2d 408 (1990). A proper restitution award must be limited to the losses caused by the specific conduct of which the defendant is convicted. While not necessarily fixed by the description given in the corresponding charge itself, the award may not include losses unrelated to the count of conviction. Bailey, 975 F.2d at 1033-34 (observing that courts have applied Hughey to reverse improper restitution orders "mainly where the trial court orders restitution for acts of which the defendant was not convicted"); accord United States v. Jackson, 982 F.2d 1279, 1283 (9th Cir.1992).
 
 
 9
 In 1990, Congress added to the VWPA a broad description of victims which provides:
 
 
 10
 For the purposes of restitution, a victim of an offense that involves as an element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.
 
 
 11
 18 U.S.C. § 3663(a)(2).[9] The amendment is widely viewed as partially overruling Hughey 's restrictive interpretation of the VWPA and expanding district courts' authority to grant restitution. See United States v. Kones, 77 F.3d 66, 69 (3rd Cir.1996); United States v. Broughton-Jones, 71 F.3d 1143, 1147 n. 1 (4th Cir.1995). The majority view is that the 1990 amendment "did have a substantive impact on the amount of restitution a court could order when a defendant is convicted of an offense involving a scheme, conspiracy, or pattern." United States v. DeSalvo, 41 F.3d 505, 515 (9th Cir.1994). Federal courts therefore now allow broader restitution orders encompassing losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme. See, e.g., United States v. Manzer, 69 F.3d 222, 230 (8th Cir.1995). The harm must be a direct result of the defendant's criminal conduct, though, or "closely related to the scheme." Kones, 77 F.3d 66, 70
 
 
 12
 For a judge properly to order payment of restitution for losses arising from a fraudulent scheme, many courts have held that the indictment must "specifically define" the scheme. See, e.g., United States v. Bennett, 943 F.2d 738, 741 (7th Cir.1991) ("The scheme concept is by its nature an amorphous one, and may only support an award of restitution if it is defined with specificity."), cert. denied, 504 U.S. 987, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992); see also Manzer, 69 F.3d at 230; DeSalvo, 41 F.3d at 514; United States v. Stouffer, 986 F.2d 916, 928-29 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993); United States v. Brothers, 955 F.2d 493, 497 (7th Cir.), cert. denied, 506 U.S. 847, 113 S.Ct. 142, 121 L.Ed.2d 94 (1992). When the scheme is clearly described in the indictment, courts have affirmed restitution orders to victims not specifically named, see, e.g., Stouffer, 986 F.2d at 928; Jackson, 982 F.2d at 1283, or in amounts not precisely stated in the indictment, see, e.g., United States v. Langer, 962 F.2d 592, 601 (7th Cir.1992); Brothers, 955 F.2d at 497.
 
 
 13
 In the matter before us, the trial court did not commit the error of ordering restitution for losses caused by acts for which the defendant was not convicted.[10] See Bailey, 975 F.2d at 1034. In order to convict Henoud of all charges arising from the Amigo scam, the United States had to prove a scheme to defraud, not just specific incidents of fraud perpetrated on individual companies. The indictment specifically describes the parameters of the call-selling scheme which the United States had to prove.[11] The jury implicitly found the existence of the scheme based upon its guilty verdict for all fourteen counts of criminal activity charged in the indictment. The acts comprising the scheme to defraud therefore constitute the conduct underlying the offense of conviction and establish "the outer limits of [the] restitution order." Stouffer, 986 F.2d at 928. And the district court's inclusion of any loss to any victim caused by the scheme to defraud would satisfy Hughey 's requirement of focusing only upon the specific conduct underlying the offense of conviction. Because the indictment alleges with specificity a scheme to defraud local and long-distance carriers, "[t]he district court had the authority to order restitution for the losses by the entire fraud scheme, not merely for the losses caused by the specific acts of fraud proved by the government at trial." Brothers, 955 F.2d at 497.
 
 
 14
 It is clear to us that the district court did not improperly order restitution in excess of its statutory authority, either with respect to the victims included or the amount awarded. As long-distance carriers, Metro Media and Allnet were directly harmed by Henoud's criminal activity and thus properly included in the restitution order as victims of the offenses. Henoud places too much emphasis on the fact that these long-distance carriers are not specifically named in the indictment. The indictments description of Henoud's criminal scheme and intended targets is sufficiently broad to include the smaller carriers also injured. See Manzer, 69 F.3d at 230; Bailey, 975 F.2d at 1033-34. The VWPA does not state that only those parties named as victims in the indictment may be awarded restitution. To the contrary, the VWPA explains that a party directly harmed by the defendant's criminal conduct in the course of a scheme or conspiracy is a victim for restitutionary purposes.
 
 
 15
 C & P is named in the indictment. The nature and mechanics of the scam outlined there clearly implicate C & P as a victim even if not expressly denominated as such. Count One alleges that Henoud acquired local telephone service using a false name as part of a scheme to defraud various companies and to obtain long-distance services by use of an unauthorized access device. The operation of such a call-selling scam requires that the local telephone company be victimized as the provider of necessary basic services and the billing agent for the long-distance carriers. Despite its omission from the indictment as a named victim, therefore, C & P was a natural victim of the scam as perhaps the only local telephone company operating in that area.
 
 
 16
 The restitutionary amount is similarly within the bounds of the court's discretion. While the indictment does allege specific acts of fraud, it also details the entire fraudulent scheme, charging that Henoud and his accomplices conspired in devising a plan whereby they would defraud various local and long-distance telephone companies by using unauthorized access devices to place overseas calls without paying for them. Because Henoud was convicted of all counts, including the conspiracy count, any direct harm resulting from the illegal scheme would properly be included in the restitution award. The district court ordered Henoud to pay restitution only for losses traceable to his illegal call-selling activity.
 
 
 17
 Consequently, we find that the district court properly exercised its discretion in awarding restitution in the amount of $24,032.22 to the five companies named.
 
 B. Sufficiency of the Evidence
 
 18
 The Government bears the burden of establishing, by a preponderance of the evidence, the amounts of restitution due each victim. 18 U.S.C. § 3664(d); United States v. Mullins, 971 F.2d 1138, 1147 (4th Cir.1992). The federal Sentencing Guidelines direct the district court to calculate "a reasonable estimate of the range of loss" in determining those amounts. U.S.S.G § 2F1.1, cmt. 8. Although we review the district court's interpretation of the Guidelines de novo, the calculation of loss for restitution purposes is a factual matter which we review only for clear error. United States v. Dozie, 27 F.3d 95, 99 (4th Cir.1994); United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir.1989).
 
 
 19
 Henoud caused loss to C & P and the long-distance carriers by using their facilities and services with an intent to defraud them. At trial and sentencing, the United States used C & P business records coupled with the testimony of a C & P employee to establish the extent of harm caused. Henoud has not challenged the accuracy or authenticity of the billing records, which were maintained in the ordinary course of business. Because they consist of the billings for local and long-distance service to the location where Henoud conducted the offense of conviction during the period that he did so, the records provide an appropriate basis for establishing the amount of loss. In addition, Henoud admitted at sentencing that he was liable for the calls placed and the charges incurred as depicted in the billing records. Twice he stipulated to the amount of loss as demonstrated by the records introduced at trial. Furthermore, Henoud has not challenged the district court's acceptance of Coulsting as an expert qualified to testify as to the charges.[12] In short, our review of the record reveals no clear error in the district court's acceptance of the losses as revealed by Coulsting's testimony and the telephone billing records admitted at trial. The court followed the dictates of U.S.S.G. § 2F1.1 by making a reasonable estimate of loss based upon the charges reflected in the billing statements. Henoud has provided neither evidence of inaccuracy nor any other reason to discount the bills. Any variation in the amounts printed on the statements and those testified to in court is minor and cured by the Government's stipulation to be bound by the lowest figure to which there was any testimony.
 
 
 20
 For these reasons, the court's restitution order is
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 The indictment explains how such "Amigo scams" typically work. The perpetrators choose an office or similar location in the United States and acquire local and long-distance telephone service. They then receive calls from foreign countries, place calls to other foreign nations, and connect the callers by conferencing features. The operators undertake all of these actions with the intent of defrauding the American telephone companies by not paying for the long-distance calls. The scams apparently originated as a way to connect calls from Israel--which has no direct long-distance telephone service to Moslem or Arab nations--to other countries in the Middle East
 
 
 [2]
 Henoud was convicted of conspiracy, in violation of 18 U.S.C. § 371, fraud in connection with an access device, in violation of 18 U.S.C. § 1029, and twelve counts of wire fraud, in violation of 18 U.S.C. § 1343
 
 
 [3]
 That amount was reflected on the total long-distance bill for the office
 
 
 [4]
 The company is now Bell Atlantic Corporation
 
 
 [5]
 The judge ordered restitution in the amounts identified by the United States' witness at sentencing
 
 
 [6]
 Coulsting had also testified at trial, presenting uncontradicted evidence as to the telephone line installation, the local telephone service charges owed to C & P, and the long-distance carrier charges generated from the office location during the period of the alleged scheme
 
 
 [7]
 For example, a long-distance call might not be included if the carrier used had not yet reported those charges
 
 
 [8]
 The Government has contended that we should not consider these issues because Henoud failed to raise them at his initial sentencing. In general, when a defendant fails to object to his sentence in district court, he waives appellate review of that sentence absent plain error. Fed.R.Crim.P. 52(b); United States v. Myers, 66 F.3d 1364, 1371 (4th Cir.1995). However, we remanded "for a determination of the restitution amount actually owed." Henoud, 1994 WL 369485, at * 7. On remand, Henoud did challenge the propriety of including C & P and the smaller carriers as victims warranting restitution. Because the scope of our remand order reasonably encompasses those matters as relevant to determining the appropriate amount of restitution, we find consideration of the issues not blocked by the mandate rule. See United States v. Bell, 5 F.3d 64, 66 (4th Cir.1993) (holding that the mandate rule prevents relitigation on remand of issues either expressly or explicitly decided by the appellate court or waived by not being raised before the district court, except in exceptional circumstances). We therefore treat the issues as properly before us
 
 
 [9]
 The provision became effective November 29, 1990
 
 
 [10]
 Every case relied on by Henoud involves the invalidation of a restitution award unrelated to the count of which the defendant was convicted. Henoud was convicted of all counts alleged in the indictment
 
 
 [11]
 As described in the indictment, the scheme to defraud local and long-distance telephone companies began with a fraudulent order for telephone service placed on September 16, 1992, and ended with Henoud's arrest on September 25, 1992. The indictment detailed the mechanics of the scheme, including the location of the operation, the duration of the criminal activity, the methods used, and some of the long-distance calls placed
 
 
 [12]
 Coulsting testified that she became familiar with C & P's billing practices through both her former position as a service representative and her current job as a security officer