**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

DARUS ZEHRBACH,
          *Defendant-Appellant.*

No. 02-4863

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

LEE ANN DEMUS,
          *Defendant-Appellant.*

No. 02-4864

Appeals from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, Chief District Judge.
(CR-00-33)

Argued: February 27, 2004

Decided: May 11, 2004

Before WIDENER, WILKINSON, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Terrance A. Bostic, Tampa, Florida; James Mack Pool,
Clarksburg, West Virginia, for Appellants. Zelda Elizabeth Wesley,

Assistant United States Attorney, Clarksburg, West Virginia, for Appellee. **ON BRIEF:** Thomas E. Johnston, United States Attorney, Clarksburg, West Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Darus Zehrbach ("Zehrbach"), an airplane engine salesman, and Lee Ann Demus ("Demus"), his secretary/financial assistant (collectively, "Defendants"), devised a scheme to defraud eight customers (the "victims") out of money, in the form of deposits and progress payments, which the victims intended to apply toward the purchase of newly developed "kit" airplane engines. Essentially, Defendants advised the victims that they had developed a specific engine, which they had, in fact, never developed. They induced each victim to contract for the allegedly developed engine and took deposits and payments from them for the alleged purpose of assembling these engines. None of the victims, however, ever received their contracted for engine or a refund, despite their requests. Upon further investigation, authorities discovered evidence suggesting that Defendants had no intention of producing any of the victims' engines, that they misrepresented the development of such engines, and that they had misused the payments received from the victims for their engines. Additionally, the victims were never informed that Demus, who handled the finances, had a prior conviction for embezzlement and forgery. Nor were the victims ever informed that, while he was supposed to be assembling engines, Zehrbach was actually serving time in prison for a prior bankruptcy fraud conviction. Ultimately, both Zehrbach and Demus, were indicted by a federal grand jury on two counts of mail fraud, and conspiracy, after authorities learned that, despite their requests, none of the victims received their engines or a refund. Both defendants were convicted by jury trial. On appeal, Defendants con-

tend that: (1) there is insufficient evidence to support the jury verdict; (2) the district court erred by denying their motion for a new trial; (3) the district court made evidentiary errors, the cumulative effect of which violated their right to a fair trial; and (4) the district court made sentencing errors. We conclude that: (1) the evidence is sufficient to support the verdict; (2) Defendants were not entitled to a new trial; (3) the district court's evidentiary rulings were not an abuse of discretion and, therefore, did not violate due process; and (4) the district court did not commit reversible error during sentencing. We, therefore, affirm.

## I.

In addition to their sentencing issues, Defendants challenge the sufficiency of the evidence supporting their convictions and contend that they are entitled to a new trial. Thus, we find it necessary to lay out the facts relating to each of the victims in some detail. We, of course, view the evidence in the light most favorable to sustaining the conviction. *United States v. Williams*, 342 F.3d 350, 355 (4th Cir. 2003); *see also United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002).

Defendants' fraudulent scheme was facilitated using Light Power Engine Corporation ("LPE"), an unincorporated West Virginia business entity.[1] Zehrbach was the president of LPE and Demus was LPE's general manager.[2] LPE's customers included recreational pilots, racers and others.

---

[1]As discussed *infra*, it is undisputed that LPE was not incorporated through the office of the West Virginia Secretary of State. Defendants contend, however, that their business was legitimate because the state taxing authorities sent them tax bills. It is undisputed, however, that LPE did not pay any taxes during the years it collected money from the victims.

[2]Defendants contend that Demus was an independent contractor and that she only worked for LPE approximately six hours per week. She argues that she had a separate business, of which she was the sole owner, whereby she performed administrative and bookkeeping tasks for various businesses, including LPE. The district court, however, found that Demus was a principal participant in LPE and the scheme to defraud.

The scheme was designed to mislead customers about the status of LPE's engines, so that customers would pay for an engine that LPE had no intention of delivering. Zehrbach promised customers that he would assemble and produce operational engines to certain specifications appropriate for experimental-class aircraft.

Between 1994 and 1996, LPE contracted with eight individuals wishing to purchase kit airplane engines. When the contracts were executed, Zehrbach advised the victims that the engines were already fully-developed and only needed to be assembled. In fact, the engines were not developed and a critical component of the engine, the "A-Section," had not been assembled or tested. Nevertheless, the victims were advised that these engines would meet a specific horsepower and weight, and would run for a specified length of time before the engines would have to be overhauled (time before overhaul or "TBO"). The Government alleged that all of these representations were false and because Zehrbach did not possess an operational engine, he could not have known the TBO.[3]

The victims were also misled regarding how their money would be handled. Each contract required a down payment and progress payments. Some victims were advised that their money would be held in an escrow account until the engines were delivered. Others were advised that their funds would not be used for salary, wages, expenses, etc. In fact, some of the victims' funds were deposited into an escrow account from which Demus would make withdrawals and deposit those funds into her personal account. In Spring 1995, for example, Demus deposited approximately $22,000 from the escrow account into her personal checking account.

As discussed above, the victims were never advised that Demus had prior convictions for embezzlement and forgery. Moreover, the victims were never advised that Zehrbach had been convicted of bankruptcy fraud and conspiracy and was out on bond pending appeal. Nor were they informed that he would have to report to federal prison—during the time he was supposedly manufacturing their airplane engines—if he lost his appeal. And, in January 1995, Zehr-

---

[3]To calculate TBO, there must be an operational engine which can run until it requires overhauling.

bach lost his appeal and was incarcerated. He never informed the victims that he was incarcerated. Instead, he sent them letters stating that he had suffered a "sudden personal crisis," but promising that production would continue "unabated." Zehrbach and Demus nonetheless continued to mislead the victims by accepting money for work they had no intention of completing and by sending letters indicating that the engines would be completed as promised.

In February 1995, for example, LPE contracted with two victims, Dr. Richard Van Grouw and Robert Horton. Neither victim was advised of Zehrbach's pending incarceration. And, both victims paid LPE deposits for their engines. In March 1995, Demus mailed letters requesting progress payments from several other victims who had previously contracted with LPE for engines in 1994, including: Paul Fagerstrom, Dick Simkanin, Gleason McMichael, Marshall Michaelian and Albert Printz. Each of these victims mailed their progress payments to LPE expecting the engines were ready for assembly. In May 1995, Zehrbach began serving his federal sentence at the Federal Correctional Institution in Morgantown, West Virginia. In June 1995, however, Demus mailed progress letters to Van Grouw and Horton requesting their progress payments. Both mailed progress payments to LPE, unaware of the fact that Zerhbach was in prison, that no engines had been produced, and that LPE did not have an engine that was operational.

At various times after August 1995, several victims became aware that Zehrbach was in jail and that their engines were not operational or did not exist. The victims requested assurances that: (1) LPE could comply with the terms of the contract, and (2) their money was secure. Zehrbach and Demus were unable to satisfy the victims' concerns and the victims thereafter requested either their engines or a refund of their deposits. Zehrbach and Demus never delivered an engine to any of the victims nor did they return any of their money.

Also, in 1996, while Zehrbach was incarcerated,[4] LPE contracted with James Harms for an engine. Harms paid a deposit of $10,083.00, and like the other victims, he never received an engine or a refund.

---

[4]Zehrbach received two criminal history points for committing this offense while in prison. J.A. at 2105.

Ultimately, the total of payments actually made to LPE by all of the victims was approximately $224,148.10, none of which was ever refunded, and no victim received an airplane engine from LPE.

On December 6, 2000, Zehrbach and Demus were indicted by a federal grand jury on two counts of mail fraud and conspiracy to commit mail fraud in violation of Title 18, United States Code, Sections 371 and 1341. On March 7, 2002, a jury trial commenced. The trial concluded on March 26, 2002. Both Zehrbach and Demus were convicted on both counts of the Indictment.

After the trial, the district court found that Zehrbach and Demus obstructed justice by fabricating documents for the trial and introducing some of those documents into evidence. The fabricated documents were offered to show that the engines were not completed because: "(1) the victims wanted engines not safe [sic], (2) the victims' indecisiveness, or (3) the victims failed to abide by the terms of the contracts." J.A. at 2094. The fabricated documents also alleged that Zehrbach advised the victims of his conviction and that he had to report to jail. The fabricated documents were purportedly dated in 1994 or 1995, however, the victims did not become aware of these documents until 2001, while preparing for the criminal trial.

Ultimately, Zehrbach was sentenced to a term of imprisonment of 51 months, to be followed by three years supervised release, and was ordered to pay restitution in the amount of $224,148.10. Demus was sentenced to a term of imprisonment of 33 months, to be followed by three years supervised release, and was ordered to pay restitution in the amount of $224,148.10. Defendants timely appealed.

## II.

When reviewing the sufficiency of the evidence following a conviction, this Court views "the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government." *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) (quoting *United States v. Burgos*, 94 F.3d 849, 863 (4th Cir. 1996) (*en banc*)) (internal quotation marks omitted). And, we must sustain the fact finder's verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United*

*States v. Myers*, 280 F.3d 407, 415 (4th Cir. 2002) (quotation omitted). *Accord Glasser v. United States*, 315 U.S. 60, 80 (1942) ("We must sustain the jury's verdict so long as there is substantial evidence to support it."); *see also*, *e.g.*, *Burgos*, 94 F.3d at 862-63. Furthermore, "determinations of credibility are within the sole province of the [fact finder] and are not susceptible to judicial review." *Lomax*, *supra*, (quotation omitted). A defendant challenging the sufficiency of the evidence to support a conviction bears "a heavy burden." *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995).

To prove a conspiracy, the Government must show an agreement to do something illegal, willing participation by the defendant, and an overt act in furtherance of the agreement. *United States v. Meredith*, 824 F.2d 1418, 1428 (4th Cir. 1987). Knowledge and participation may be shown by circumstantial evidence. *Id.* Once a conspiracy has been established, it is only necessary to show a "slight connection between the defendant and the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992). Mail fraud requires a showing of (1) knowing participation in a scheme to defraud and (2) a mailing in furtherance of the scheme. *United States v. Dozie*, 27 F.3d 95, 97 (4th Cir. 1994) (citing 18 U.S.C. § 1341 and *United States v. Odom*, 736 F.2d 104, 109 (4th Cir. 1984)).

With these principles in mind, we turn first to Defendants' claim that the evidence at trial was insufficient as a matter of law to support the verdict against them on the conspiracy and substantive mail fraud counts. Afterward, we address their motion for a new trial.

A.

Defendants contend that there was insufficient evidence to support the jury's verdict as to Count One (conspiracy to commit mail fraud) and Count Two (substantive mail fraud). Specifically, Defendants argue that the Government's failure of proof is "on the element of intent." Appellant's Br. at 29. Thus, Defendants assert that the district court erred by denying their motions for judgment of acquittal. We disagree.

An essential element of mail fraud and conspiracy to commit mail fraud is "knowing participation in a scheme to defraud." *Dozie*, 27

F.3d at 97; *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992); *United States v. Bush*, 522 F.2d 641 (7th Cir. 1975). Because direct evidence of intent is scarce, the Government may of course rely on circumstantial evidence to carry its burden. *United States v. Diamond*, 788 F.2d 1025, 1030 (4th Cir. 1986). Thus, "intent to defraud may be inferred from a defendant's statements and conduct." *Peters*, 962 F.2d at 1414 (citation omitted); *see, e.g.*, *United States v. Van Dyke*, 605 F.2d 220, 222-25 (6th Cir. 1979) (intent to defraud inferred from evidence, including the defendant's failure to respond to customer complaints); *United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985) (intent to defraud inferred from evidence that defendant took steps to conceal illegal activities).

In order to convict Defendants of mail fraud, it is enough that the Government charged and the jury found either that a victim was actually deprived of money or property or that Defendants intended to defraud a victim of the same. *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989). A scheme to defraud, whether successful or not remains within the purview of the mail fraud statute as long as the jury finds an intent to obtain money or property from the victim of Defendants' deceit. *Id.* Thus, in a prosecution for mail fraud, the necessary intent may be shown by evidence that Defendants devised a fraudulent scheme or participated in it with knowledge of its fraudulent nature. *United States v. Perkal*, 530 F.2d 604, 606 (4th Cir. 1974)("It is well settled that anyone who 'knowingly and intentionally' participates in the execution of a fraudulent scheme involving the use of the mails comes within the prohibition of this section, and this is true whether the indictment charges a conspiracy or not."); *United States v. Sturm*, 671 F.2d 749, 751 (3d Cir. 1992).

Finally, under 18 U.S.C. § 1341, the fraudulent scheme need not be one which includes an affirmative misrepresentation of fact since it is only necessary for the Government to prove the scheme was calculated to deceive persons of ordinary prudence. *United States v. Bohonus*, 628 F.2d 1167, 1172 (9th Cir. 1980). Similarly, deceitful concealment of material facts is not constructive fraud but actual fraud. *Id.*

The Government contends that Defendants participated in a scheme to defraud kit airplane engine purchasers by offering to sell airplane

engines they did not intend to deliver. In support of this charge, the Government presented evidence that Defendants, through LPE, entered into contracts to sell airplane engines to eight individuals. To procure those contracts, Defendants advised the purchasers that the engines were fully developed and only needed to be assembled, when in fact the engines offered had not even been developed. Defendants, however, contend that there was insufficient evidence from which a rational trier of fact could conclude beyond a reasonable doubt that LPE did not intend to deliver the engines.[5]

As to victim Harms, Defendants assert that "Zehrbach did not intend to or actually defraud Harms." Appellants' Br. at 29. It is undisputed that Harms made a down payment for an engine, as required by Defendants. Likewise, it is undisputed that Harms requested modifications and a delay in the production, which Zehrbach agreed to accommodate. What is disputed, however, is why Harms never received the engine or a refund of his money. According to Defendants, "Harms ceased communication with Zehrbach and did not make any additional payments on the engine. [And,] Zehrbach made repeated attempts to contact Harms regarding his engine, but Harms did not respond." Appellants' Br. at 29. The Government, however, adduced evidence that, contrary to Zerhbach's representation that he had developed an engine that would meet his customer's requirements, no such engine was *ever developed*, tested or operational. J.A. at 238, 550, 649, 793-95. Thus, whatever Harms' intentions were, the Government contends that *Zehrbach never intended to deliver the engine* Harms paid for. And, there was competent evidence that, even after an extended delay, Harms demanded his engine or a refund, yet LPE never refunded his money or delivered the engine (or at least that portion thereof that Harms actually paid for). Indeed, none of the victims received an engine or a refund, despite their requests.[6] Even Defendants concede that there was a complete

---

[5]Demus' conviction rises and falls on Zehrbach's insofar as she was alleged to be a co-conspirator of the scheme to defraud.

[6]As to some of the victims' claims, "Zehrbach testified it was his belief that he was justified in retaining the engine parts and refusing refunds due to cancellations, repudiations, and/or other breaches of contract . . . ." Appellants' Br. at 32. From the record, however, it seems that Zehrbach, by failing to deliver the engines, materially breached the contract. The victims each paid their deposit payments and progress payments as required and, therefore, it does not appear that any victim materially breached the agreement. Thus, the jury was entitled to disregard Zehrbach's defense on this point.

"failure to deliver the engines . . . . " Appellants' Br. at 39.[7]

In a mail fraud prosecution, evidence that the victims suffered losses and the defendant refused to make good those losses is relevant to show the defendant's specific intent to defraud. *United States v. Copple*, 24 F.3d 535, 545 (3d Cir. 1994); *see also Van Dyke*, 605 F.2d at 222-25 (intent to defraud inferred from evidence, including the defendant's failure to respond to customer complaints); *Anderson v. United States*, 369 F.2d 11, 15 (8th Cir. 1966)(defendant's failure to take any steps to ameliorate the victims' loss is indicative of fraudulent intent). Thus, a rational jury could infer that because LPE neither refunded Harms' money nor delivered any portion of the goods for which Harms actually tendered payment, they never intended to do so. The same is true for each victim because no victim received a refund or an engine or even an explanation or response to their claims.

The same can be said for each of the victims' progress payments for the supposedly "ready to assemble" engines.[8] The victims' contracts each called for progress payments of 50% when the engines were being assembled. J.A. at 633, 779. When a progress letter was mailed, the customer was required to mail their 50% payment to LPE to cover the costs of the engine's assembly. J.A. at 231, 310, 449, 546. Yet, despite receipt of several progress payments, LPE never assembled more than one engine. Appellee's Br. at 15-16. And, it is

---

[7]Defendants contend, however, that this complete failure only constitutes "poor judgment, which does not rise to the level of reckless indifference [or] constitute fraud." Appellants' Br. at 39.

[8]Defendants contend that "the contracts at issue do not state that a progress payment is due when the engine is ready for assembly . . . the 50% progress payment is due when 'components are on hand.'" Appellants' Br. at 38 (citing J.A. at 63). One of the progress letters stated: "We have been notified by our suppliers that all of the components as required for the progress payment for your engine will be in our hands by April 14-15. This is to advise you that your progress payment of $21,500.00 is due." Appellant's Br. at 38. Even if we were to agree with Defendants' construction of the progress letters, there was insufficient evidence that any engine components were actually delivered to LPE to manufacture each of the victims' engines.

undisputed that engine—the somewhat similar "Morris Engine"—was not the engine that any of the victims contracted for.

As further evidence of fraud and misrepresentation, the Government offered evidence showing that Zehrbach represented to the victims that he had numerous, fully developed operational engines, that those engines would meet a specific horsepower and weight, and that those engines had a TBO of 2,200 hours.[9] None of this, however, was true since no such engine had ever been produced by LPE. Instead, the Government demonstrated that Defendants used these promises to collect money from the victims who were expecting delivery of such an engine. Defendants, however, assert that "[t]here is absolutely no evidence that any of the money collected from the alleged victims was used for any other purpose than the construction of their engines." Appellant's Br. at 31. They also argue that "[i]f Zerhbach did not intend to deliver the engines and was simply enriching himself before his period of incarceration, he would not have spent all of the money collected from the alleged victims on their engines." *Id.* In support of this argument, Defendant's offered at trial invoices totaling $208,000.00 for parts and services related to the engines at issue. The total amount of loss, however, was approximately $224,000.00, a difference of $16,000.00.[10]

A rational jury could have properly disregarded the defense on this point, in its entirety. At sentencing, Zehrbach received an enhancement for obstruction of justice, perjury,[11] fabricating documents for the trial, and introducing some of those documents into evidence.[12]

---

[9]According to the Government, the TBO was important to the victims because it indicates that the engine had been run numerous times. Appellee's Br. at 5 (citing J.A. at 764).

[10]Defendants contend there were other expenses for which they have no receipts.

[11]Zehrbach attempted to retaliate against the victims by filing a false statement with the FBI alleging that the victims were engaged in terrorist activities. J.A. at 2093, 2130. Before the district court, Zehrbach contended that he made the statement several years prior to the incidents at issue in this case. However, his written statement to the FBI is dated September 15, 2001 and the letter references the attacks on the World Trade Center. *See* Government's Br. at 11-12.

[12]The fabricated documents are discussed briefly *supra* at Part I.

J.A. at 2101. Indeed, the documents at issue related to these invoices, which Defendants' offered as proof of their intent to perform.

Moreover, much of Defendants' case rests upon their own testimony explaining their conduct. Yet, both defendants were convicted of felonies evidencing a history of untruthfulness. Zehrbach was out on bond pending appeal of his conviction for bankruptcy fraud and conspiracy during much of the time that these transactions occurred. Demus had prior embezzlement and forgery convictions. Yet, she was responsible for sending the progress payment letters, making deposits, and had signature authority on LPE's business and escrow accounts. Moreover, the Government offered evidence that Demus withdrew the victims funds from LPE's escrow account and deposited the funds into her personal checking account.[13] Of course, none of this was disclosed to the victims. In fact, Zehrbach and Demus assured the victims that their funds were secure. *See* J.A. at 469 (letter advising customers that funds are in an "escrow account" and that they may "verify this information with Lee Ann"). Additionally, the victims were never advised that Zerhbach was serving a term of imprisonment while he was supposed to be manufacturing their engines.[14] Based upon both Defendants' prior felony convictions and their conduct in

---

[13]Demus contends that since she was the sole shareholder of her company, which she argues was an independent contractor of LPE, she was justified in depositing money into her personal account. A rational jury, however, could have easily concluded that Demus' conduct was improper and discredited her testimony accordingly.

[14]Demus, at the behest of Zehrbach, sent a letter to the victims stating that Zehrbach suffered a "sudden personal crisis," and that the engines would be delivered on time. J.A. at 233, 313, 405, 466, 548, 636, 789. The letter stated:

> Please be advised that I have suffered a sudden, personal crisis that has caused me to be unavailable and is taking a considerable amount of my time. Production and deliveries of one hundred percent of all propellers, air conditioning systems, vibration dampeners and aircraft kits will continue absolutely unabated for every single customer. This will mean that engine deliveries will be minimally affected, if at all.

J.A. at 637.

the instant case, a rational jury could have properly discounted or entirely disregarded Zehrbach's and Demus' testimony.

This evidence alone—though there is much more—is sufficient evidence from which a reasonable fact finder could infer that either Zehrbach, Demus, or both, intended to defraud the victims. Specifically, there is evidence of actual fraud insofar as no victim ever received an engine or a refund, despite their requests. J.A. at 320, 551-56, 639, 800-02. The circumstantial evidence is even more sufficient.[15]

Accordingly, it is "clear that the trial record contained sufficient evidence to support [each Defendant's][16] conviction." *Wright v. West*, 505 U.S. 277, 296-97 (1992)(citation omitted) (A reviewing court "faced with a record of historical facts that supports conflicting infer-

---

[15]Defendants' argument that there is no direct evidence of fraudulent intent is unavailing. We have often held that direct evidence of intent is unnecessary. *See United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). In *Jennings*, we held that to prove bribery, the Government is not required to prove an expressed intention (or agreement) to engage in a *quid pro quo*. Such an intent may be established by circumstantial evidence. *Id.* (citing *United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996) and *United States v. Biaggi*, 909 F.2d 662, 684 (2d Cir. 1990)).

The Government established that none of the victims were ever made aware of Zehrbach's and Demus' prior convictions for crimes involving financial dishonesty; that Demus withdrew money from a business escrow account and deposited it into her own personal checking account; and that, Zerbach had not even come close to producing 8 engines for the 8 victims. This evidence is more than sufficient to sustain Defendants' conviction for conspiracy.

[16]The fact that some of the fraudulent events were perpetrated by Zehrbach or Demus separately, is of no consequence since each actor in a conspiracy is liable for the acts of the other done in furtherance of the conspiracy. Indeed, the elements of fraud may be satisfied either by a principal acting alone, or through the acts of agents. *e Plus*, 313 F.3d at 180 (citing *Dudley v. Estate Life Ins. Co. of Am.*, 220 Va. 343, 257 S.E.2d 871, 875 (1979) ("A principal who puts a servant or other agent in a position which enables the agent . . . to commit a fraud upon third persons is subject to liability to such third persons for the fraud.")).

ences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.")

## B.

Count II of the Indictment charged that on or about December 15, 1995, Zehrbach and Demus caused to be delivered in the United States mail a check in the amount of $6,649.00 "for the purpose of executing and attempting to execute a scheme and artifice to defraud." Defendants, however, contend that there is insufficient evidence from which a rational trier of fact could find the elements of mail fraud beyond a reasonable doubt.

The specific fact challenged under this Count relates to the Government's allegation that one of the victims, Simkanin, did not receive his propeller, which he paid for. The Defendants' evidence to the contrary consists of a memo jointly authored by two of Defendants' suppliers and another person, Mr. Johnson, who testified that he saw a "five blade white propeller with red tips at [Simkanin's] location in early 1996." Appellants' Br. at 40-41. To prove that the propeller Johnson saw was the propeller Zehrbach was to provide Simkanin, Defendants offered Zehrbach's testimony "that the propeller ordered for Simakanin was a five blade white propeller with red tips." Appellants' Br. at 41. As discussed above, however, the jury may have discounted entirely any or all of Zehrbach's testimony on account of his felony convictions and history of dishonesty. *See* Ante at II.A. at 11-12. Thus, his testimony would not have been sufficient to rebut the Government's evidence, including Simkanin's own testimony, that Zehrbach never delivered the propeller. Accordingly, the convictions under Count II are supported by sufficient evidence.

## III.

Defendants contend that the district court erred by denying their motion for a new trial. They based their motion upon a statement made by the Government during closing arguments. Essentially, in response to an argument made by defense counsel—suggesting that the Government purposely failed to review some invoices, which Demus now alleges were available at trial (as evidence that she and

Zehrbach actually paid for engine parts)—the Assistant United States Attorney ("AUSA") responded during rebuttal that she had reviewed numerous documents and never found any "checks" substantiating Defendants' claims of payment.[17] Both defense counsel objected below. In direct response, the district court admonished the AUSA not to testify and gave a curative instruction.[18] The district court, however, denied Defendants' motion for a new trial stating the mistake was "egregious and extremely unfortunate" but that the curative instruction and admonishment were sufficient. J.A. at 1849-58.

In some cases, "prejudicial arguments by the prosecutor pose a serious threat to a fair trial." *Miller v. North Carolina*, 583 F.2d 701, 706 (4th Cir. 1978). In *Miller*, we noted that such arguments "[n]ot only . . . undermine the jury's impartiality, but it also disregards the prosecutor's responsibility as a public officer." *Id.* (citing *Berger v. United States*, 295 U.S. 78, 85, 88 (1935)). However, as this Court noted in *Miller*, such egregious conduct on the part of the prosecutor refers to seriously egregious arguments, such as, "where the prosecutor appealed to the jury's sense of patriotism in a wartime prosecution" or where the prosecutor's arguments appeal to "racial prejudice." *Id.* at 706-07. Even in those cases, however, this Court noted that curative instructions may be sufficient. *Id.* at 707 ("There may also be instances where the curative instructions of the trial judge are so immediate and decisive that the prejudicial effects of the argument are effectively dispelled.")[19]

In this case, however, the district court gave an "immediate and

---

[17]The parties do not dispute the statements made by counsel during closing arguments. *See* Appellants' Br. at 42-44; Government's Br. at 19-21. Essentially, Defendants' produced *invoices*, but never produced any *checks* (cancelled or not cancelled) to substantiate their claim that they "paid" money for expenses and parts.

[18]The district court instructed the jury that the prosecutor was not allowed to testify; that there was no evidence to support her remarks; that she should not have made the remarks; and that the remarks were stricken from the record. The district judge also admonished counsel to "watch what you say." J.A. at 1765hh.

[19]We did not reach the efficacy of curative instructions, however, because none was given in *Miller*. *Miller*, 583 F.2d at 707.

decisive" curative instruction that sufficiently dispelled any prejudice wrought by the AUSA's remark. *See id.*; *see also United States v. Harrison*, 716 F.2d 1050, 1053 (4th Cir. 1983)(holding that the court's curative instructions cured any prejudice created by prosecutor's improper remarks).[20] To be sure, this Court has developed a two-prong test for determining whether an error "so infected the trial with unfairness as to make the resulting conviction a violation of due process." *United States v. Wilson*, 135 F.3d 291, 297 (4th Cir. 1998)(citations omitted). Specifically, a defendant "must show (1) that the [prosecutor's] remarks were improper and (2) that they 'prejudicially affected the defendant's substantial rights so as to deprive [him] of a fair trial.'" *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995) (quoting *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993)); *accord United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994); *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988). There can be no dispute that the prosecutor's remark was improper; the Defendants, however, must still establish prejudice. This they cannot do.

In *Wilson*, we noted that several factors are relevant to the determination of prejudice, including:

> (1)  the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused;
>
> (2)  whether the remarks were isolated or extensive;
>
> (3)  absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and

---

[20]In *Harrison*, we held that a trial judge's curative instructions are usually sufficient to cure any prejudice brought about by counsel's statements of opinion or personal belief during arguments. We stated that curative instructions "by the trial judge, combined with the fact that the prosecutor's comments were not used to bolster his case, but instead were provoked by defense counsel's vitriolic attack, leads us to the conclusion that the defendants' trial was not 'so fundamentally unfair as to deny [them] due process.'" 716 F.2d at 1053 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 645 (1974)).

(4)   whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

135 F.3d at 299 (quoting *Adam*, 70 F.3d at 780)(other citations omitted). As to each of these elements, the facts are substantially in favor of the Government.

First, as the district court noted, the AUSA's statement was "egregious and unfortunate" but it was not the kind of remark which has an inherent tendency to mislead the jury and to prejudice the accused. *See*, *e.g.*, *Miller*, 583 F.2d at 706-07 (discussing prosecutorial arguments that are inherently prejudicial). Second, the remarks were "isolated" rather than "extensive." *Wilson*, 135 F.3d at 299.[21] Third, as discussed above, the competent proof of guilt notwithstanding the prosecutor's remarks was significant.[22] And, fourth, there is no evidence that the AUSA made her remarks "deliberately . . . to divert attention to extraneous matters." *Id.* at 299.[23]

"We also consider (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel, and (6) whether curative instructions were given to the jury." *Id.* While there is no evidence that defense counsel engaged in any improper conduct to provoke the AUSA's remarks, it is clear that her remarks were in direct response to defense counsel's suggestion during closing arguments that the Government was hiding evidence from the jury. And, as noted before, a curative instruction was given to the jury.

As we noted in *Wilson*, "these factors are examined in the context of the entire trial, and no one factor is dispositive." *Id.* In this case, however, each factor points toward a finding of no prejudice. Accordingly, the district court's curative instruction was sufficient and a new trial was not required.

---

[21]Defendants concede that the "prosecutor's remarks were not extensive . . . ." Appellant's Br. at 49.

[22]Defendants concede that this point rises or falls on their arguments as to the sufficiency of the evidence. Appellants' Br. at 49.

[23]Defendants contend that the prosecutor's remark was deliberate because her case against Defendants was "weak." Appellants' Br. at 50. As discussed above, we obviously disagree.

IV.

Defendants argue that the "combined effect" of the district court's evidentiary rulings admitting certain evidence and excluding other evidence was an abuse of discretion and denied them their right to a fair trial. Appellants' Br. at 50.

Ordinarily, we review a trial judge's evidentiary rulings for abuse of discretion. *United States v. Hill*, 322 F.3d 301 (4th Cir. 2003). Defendants, however, do not contend that any one of the district court's evidentiary rulings was an abuse of discretion. Rather, Defendants argue that the combined effect of the district court's evidentiary rulings deprived them of a fair trial. This Circuit has no published opinions addressing such a "combined effects" claim, and we are doubtful that such a claim is viable.[24]

Nevertheless, because Defendants' argument is based upon their "right to a fair trial," we must be mindful that when determining the fairness of a criminal trial our ultimate concern must be whether "the trial judge's [decisions] were so prejudicial as to deny a party an opportunity for a fair and impartial trial." *United States v. Goodwin*, 272 F.3d 659, 673 (4th Cir. 2001) (quoting *United States v. Gastiaburo*, 16 F.3d 582, 589-90 (4th Cir. 1994)); *see also Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987). On the other hand, while a criminal defendant "is entitled to a fair trial" he is not entitled to "a perfect one." *Lutwak v. United States*, 344 U.S. 604, 619 (1953). "A fair trial in a fair tribunal is[, nonetheless,] a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 942 (1955). And, the proper role of a trial judge, most simply, is "to see that justice is done in the cases heard before him [or her]." *Simon v. United States*, 123 F.2d 80, 83 (4th Cir. 1941). Given this framework, we turn next to apply the relevant legal principles to the instant case.

If we have properly construed Defendants' contentions, we understand them to say that the district judge's rulings amounted to partiality. We must, then, consider our cases on the proper conduct of trial

---

[24]Appellants have not pointed us to any authority on this point. And, we have not found any published decisions from our sister circuits addressing such a claim either.

judges. In *United States v. Head*, 697 F.2d 1200 (4th Cir. 1982), for example, the defendant asserted that there was improper judicial interference when the court interjected itself over 2,400 times in a four-day trial. Head maintained that the judge's questions, combined with adverse evidentiary rulings (some based on judicial misconstructions of both facts and law), put the judge in partnership with the prosecution. Despite the fact that "there was in this trial a distressingly frequent exercise of the trial court's undoubted discretionary prerogative —and duty on appropriate occasions—to intervene *sua sponte* in the proceedings," the court found no prejudice. *Id.* That is because the judge's "patent over-involvement" and criticisms were directed at both sides, not affecting one more than the other. *Id.*; *cf. Anderson v. Warden, Md. Penitentiary*, 696 F.2d 296, 299 (4th Cir. 1982) (finding prejudice, in harmless error analysis, where "[t]he judge openly and successfully pressed defendant's two key witnesses to change their testimony"); *United States v. Cassiagnol*, 420 F.2d 868, 878 (4th Cir. 1970) (finding prejudicial error where court interrupted both defendant's direct examination and defense counsel's summation with comments characterized as "sharp," "critical," and "chiding"). In this case, however, there is no evidence that the district court was more lenient toward the Government than it was toward Defendants. Indeed, Defendants make no such argument. Most importantly, there is no evidence in this case of partiality impinging upon the defendant's right to a fair trial akin to that in *Cassiangol*, *supra*, 420 F.2d at 878.

Moreover, in *Goodwin*, we affirmed the defendant's conviction despite the fact that one judge concluded that the "trial judge's hostile and extensive questioning of defense witnesses made it appear that she was on the side of the government." *Goodwin*, 272 F.2d at 681. (Michael, J., dissenting). We did so because we concluded that Goodwin's defenses were "predestined to failure." *Id.* Thus, in this case, the fact that the evidence was otherwise sufficient to sustain the conviction and the fact that Defendants do not argue that the district court's rulings somehow impaired their defenses, suggests that whatever we make of their "combined effects" claim, it is inconsequential.

As we explained previously in *Head*, "we review for prejudicial trial court error in the specific case and not, except in the most occasional exercise of our supervisory powers, generally to police the con-

duct of trials against some general model of judiciousness." 697 F.2d at 1210. Thus, it seems that we may not further review Defendants' "combined effects" claim since more exacting review would be tantamount to policing the district court for some "general model of judiciousness." *Id.* Consequently, Defendants' claim may only succeed if one or some of the district court's evidentiary rulings constituted an abuse of discretion. This, however, is an argument Defendants do not make.[25] And, defense counsel offered no further explanation of their theory at oral argument, nor did they demonstrate how any one of the district court's evidentiary rulings was an abuse of discretion. Instead, Defendants claim that the "cumulative result of these rulings denied the Defendants' their right to a fair trial." In any event, we have reviewed each of Defendants' individual objections, and none alone justifies reversal. Accordingly, the cumulative effect of the district court's rulings could not be prejudicial and Defendants' right to a fair trial has not been violated.

Because none of the district court's evidentiary rulings alone constitutes an abuse of discretion, the "combined effects" thereof could not compel reversal; nor did the district court's rulings, even when considered in the aggregate, violate Defendants' due process rights.

V.

Defendants contend that the district court erred at sentencing by erroneously calculating the amount of loss, the amount of restitution, and by failing to allow Defendants an opportunity to allocute. The Defendants also challenge the district court's calculation of Zehrbach's sentence under Count II, and its decision not to grant his motion for downward departure. We find no reversible error in any of these determinations.

---

[25]Defendants concede that "the adverse effect of any one of the above rulings would not, in all likelihood, [have] been of such magnitude so as to affect the substantial rights of the Defendants. . . ." Appellants' Br. at 56.

A.

Defendants contend that the district court incorrectly determined the amount of loss by including the loss suffered by Harms, Horton, Fagerstrom and McMichael. Likewise, they contend it was error for the court to order restitution based upon these losses. They argue that "the losses allegedly suffered by Horton, Harms and Fagerstrom should not be included because there was absolutely no evidence of any fraud related to them." Appellants' Br. at 59. And, Defendants concede that their lack of evidence claims are based entirely upon their sufficiency of the evidence claim, which we dismissed above. *Id.* Thus, their claim should properly fail based upon our conclusion that there is sufficient evidence to sustain the conviction. In any event, there is independent evidence that each victim suffered a loss as a result of the fraud. Fagerstrom entered into a contract with LPE in July, 1994, and paid an initial deposit of $10,875. In response to a March 1995 progress letter sent by Demus, Fagerstrom made a progress payment in the mount of $18,125.00. Fagerstrom never received an engine or a refund, and there is sufficient evidence from which a rational jury could find that Zehrbach and Demus never developed or assembled the engine the victims contracted for. The same is true in the cases of Harms, Horton and McMichael. *See* J.A. at 2097-2101 (PSR). Thus, Defendants' objection is without merit and the court's loss calculation was not erroneous. Likewise, the restitution ordered as to each of these victims was not erroneous. *See United States v. Henoud*, 81 F.3d 484, 487 (4th Cir. 1996)("In general, criminal restitution orders should not be overturned in the absence of an abuse of discretion.").

B.

Defendants argue that the district court denied them their right of allocution. During the sentencing hearing, both defendants moved for a downward departure. And, the district court asked each defendant if he or she wished to allocute. Zehrbach indicated that he wished to allocute after the court addressed his motion for downward departure. Government's Br. at 26 (citing Sept. 4 Sentencing Hearing Transcript at 114). Likewise, during Demus' sentencing hearing, the court indicated that allocution should occur after the departure issue was addressed. *Id.* (citing Sept. 11 Sentencing Transcript at 156). Accord-

ing to the Government, "[b]oth sentencing hearings were continued until October 18, 2002 [sic], with all of the parties anticipating that all of the issues were addressed except the departure issue." *Id.* During the October 18th hearing, Zehrbach testified and was, thus, given an opportunity to address the court. *Id.* Neither defendant requested a separate allocution during the October 18th hearing, nor did they object to their failure to receive one. Thus, that argument may have been waived, and is subject only to plain error review.[26]

In any event, Federal Rule of Criminal Procedure 32 requires that the district court "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii) (2003); *United States v. Cole*, 27 F.3d 996 (4th Cir. 1994); *United States v. Miller*, 849 F.2d 896, 897 (4th Cir. 1988). Both defendants' right to allocute was "addressed," and each defendant had an opportunity to speak as to mitigation in conjunction with their motions for downward departure. Thus, it seems that the district court complied with its duty under Rule 32. In any event, we need not reach that issue here because, even if the district court failed to afford Defendants a separate opportunity to allocute, that error was not plain and can not be reversed on this record.

---

[26]*See United States v. Karam*, 201 F.3d 320, 330-31 (4th Cir. 2000)(failure to object to denial of allocution is reviewed only for plain error, and if guidelines were properly applied, Defendants are not prejudiced and error is not plain); *United States v. Ford*, 88 F.3d 1350, 1355-56 (4th Cir. 1996); *United States v. Grubb*, 11 F.3d 426, 440 (4th Cir. 1993) (failure to object to sentencing errors below results in waiver of those arguments on appeal unless error was plain error); *see also*, *United States v. Torry*, 166 F.2d 1211 (4th Cir. 1998) (Table unpublished)("[A]ssuming without deciding that the district court erred in failing to provide Torry with an opportunity to allocute, the error was not plain.") (citing *United States v. Alli-Balogun*, 72 F.3d 9, 12 (2d Cir. 1995) (stating that "we do not see how an error can be plain error when the Supreme Court and this court have not spoken on the subject, and the authority in other circuit courts is split")).

## C.

Defendants contend that the district court erred when calculating Zehrbach's sentence under Count II by including the loss from Count I in its calculations for Count II. The district court, however, sentenced Zehrbach to serve his sentences for Counts I and II, concurrently. And, as discussed above, Zehrbach's sentence as to Count I was not erroneous. Because Zerhbach contends that his offense level as to Count II should have been a 14 rather than a 20, but his offense level as to Count I was properly calculated to be 20, any error by the district court would be harmless given the concurrent nature of the sentences. Even if Zehrbach achieved a reduced sentence on Count II, his term of imprisonment would remain the same because his sentence under Count I was properly calculated based upon his offense level of 20. Thus, we may not reverse Zehrbach's sentence under Count II.

## D.

Defendants contend that the district court erred by denying their motions for downward departure under U.S.S.G. § 5K2.0 for unjust enrichment. "[O]ur ability to review a district court's decision whether, and to what extent, to depart downward from the sentence required by the Guidelines is fairly circumscribed. We are not permitted to review a district court's refusal to depart downward from the Sentencing Guidelines unless 'the district court was under the mistaken impression that it lacked the authority to depart.'" *United States v. Shaw*, 313 F.3d 219, 222 (4th Cir. 2002)(quoting *United States v. Carr*, 303 F.3d 539, 545 (4th Cir. 2002) (internal quotation marks omitted)). The district court clearly stated that it had authority to depart, J.A. at 2010-12, thus we may not review its decision any further.

## VI.

As discussed above, Defendants' challenges to their convictions and sentences fail. Accordingly, we affirm the judgment of the district court as to both Zehrbach and Demus.

*AFFIRMED*